R. Perry COLLINS and Marjorie Collins

v.

UNITED STATES of America.

R. P. COLLINS & COMPANY, Inc.,

v.

UNITED STATES of America.

Civ. A. Nos. 59–154–F, 59–275–F.

United States District Court
D. Massachusetts.
April 10, 1961.

Roger P. Stokey, Goodwin, Proctor & Hoar, Boston, Mass., for plaintiffs.

Elliot L. Richardson, U. S. Atty., James C. Heigham, Asst. U. S. Atty., Boston, Mass., for defendant.

FRANCIS J. W. FORD, District Judge.

These are actions to recover income taxes and interest alleged to have been illegally assessed and collected. The parties have entered into stipulations as to several counts in each action. In 59–154–F the remaining issues to be decided involve the tax status of a payment received by the individual plaintiffs for stock transferred to plaintiff corporation and the deductibility of a claimed casualty loss. In 59–275–F there remain for decision questions as to the deducti-

bility of losses incurred by a subsidiary of plaintiff corporation.

## Deductibility of Losses

R. P. Collins & Company, Inc. is a Massachusetts corporation organized in 1934 engaged in the wholesale buying and selling of wool and mohair unprocessed or in the form of tops. Of the 1472 shares of stock outstanding on September 1, 1954, plaintiff R. Perry Collins owned 672 shares, his wife Marjorie C. Collins owned 356 shares and the remaining shares were owned by their four daughters or owned in trust for the benefit of the daughters. Collins Wool Corporation, a Massachusetts corporation organized in 1942, was a wholly owned subsidiary of R. P. Collins & Company, Inc. and was engaged in a similar line of business.

Priscilla Worsted Mills was a Rhode Island corporation organized in 1906. It owned a mill at Johnston, Rhode Island, and its principal business was the manufacture of worsted yarns of various sizes and characteristics. It had operated at a small profit in 1950, 1951 and 1952. In 1953 it had an operating loss of $222,806 and the principal stockholders during that year decided to dispose of the business. David Seaman, a minority stockholder, did not wish to sell his interest. He believed that the mill as a result of recent renovations was capable of efficient operation, that its overhead expenses could be substantially reduced and its sales organization improved and hence that it could be operated profitably if, as he expected, there would be an upturn in the textile industry after a slump which it had suffered during 1953. He made unsuccessful efforts during the latter part of 1953 to secure financing from banks or to persuade some other mill owner to acquire the stock of Priscilla at $200 a share. In October he talked with Collins, who was not then interested in buying the stock. He met Collins and his attorneys in January 1954, at which time they discussed among other factors the operating losses of Priscilla and also the possibility of a substantial tax loss which might result from a quick sale of Priscilla's assets. Collins was still not interested in acquiring an interest in Priscilla. Priscilla suffered further losses in January and February of 1954. In February, Collins, after further consideration and after discussion with his tax advisers, offered to buy the Priscilla stock at $175 a share subject to certain adjustments. This offer was accepted and an agreement for the purchase and sale of the stock was signed March 1, 1954.

On March 24, 1954, pursuant to that agreement R. P. Collins & Company, Inc. bought 800 shares and Collins Wool Corporation 400 shares of the common stock of Priscilla, at $170.34 a share, for a total price of $204,408. The only other stock of Priscilla outstanding was 200 shares owned by Seaman. Under an agreement made on or about March 1, 1954, R. P. Collins & Company, Inc. had an option to purchase these shares. It exercised that option on May 21, 1954, acquiring the 200 shares for the price of $25,396.22. On March 30, 1954, Priscilla had purchased from Collins Wool Corporation 400 shares of its own stock at $170.34 a share, so that after May 21, 1954, there were 1,000 shares outstanding, all owned by R. P. Collins & Company, Inc.

Priscilla continued to operate at a loss after March 1, 1954, in spite of certain changes undertaken in accordance with Seaman's ideas for making the operations profitable. Sometime before May 21, 1954, a decision was made to close the business. In June an agreement was made for the sale of the plant and equipment for $115,000 and this sale was carried out in July, 1954.

Some months after this sale Priscilla began to do business as a wholesaler of wool and mohair, the same type of business conducted by R. P. Collins & Company, Inc. and its other subsidiary Collins Wool Corporation. On May 26, 1955, Priscilla changed its name to Collins Wool Corporation and on December 1, 1955, qualified to do business in Massachusetts. Meanwhile the orig-

inal Collins Wool Corporation was liquidated and dissolved on August 31, 1955. The new Collins Wool Corporation (formerly Priscilla) was liquidated and dissolved on August 31, 1957.

In the amended consolidated income tax return of plaintiff corporation for the fiscal year ending August 31, 1954, the post-affiliation losses of Priscilla Worsted Mills in the amount of $193,-067.13 (consisting of operating losses of $42,139.45 for the period from May 21 to the end of the fiscal year and capital losses of $150,927.67 consisting chiefly of the loss on the sale of the plant and equipment) were used to fully offset the total profit of both R. P. Collins & Company, Inc. and Collins Wool Corporation.

Plaintiff corporation's right to use these losses of Priscilla to offset gains of the other corporations on its consolidated return depends on the purpose for which it acquired the Priscilla stock.

■ Under § 141 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 141, affiliated corporations were given the privilege of filing a consolidated income tax return. Corporations were considered to be affiliated when the parent owned at least 95 per cent of the stock of the subsidiary. Hence in this case Priscilla became an affiliate on May 21, 1954. Under this section an affiliated corporation may not be included in the consolidated return where it was brought into the affiliated group solely for tax savings reasons without any independent business reason. David's Specialty Shops v. Johnson, D.C., 131 F.Supp. 458; Elko Realty Company v. Commissioner of Internal Revenue, 29 T.C. 1012, affirmed per curiam, 3 Cir., 260 F.2d 949; J. D. & A. B. Spreckels Co. v. Commissioner, 41 B.T.A. 370.

■ Under § 129 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 129, where a corporation acquired control of the property of another corporation and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit or allowance which the corporation would not otherwise enjoy, then such deduction is not to be allowed. As to this section the significant date is March 24, 1954, when R. P. Collins & Company, Inc. acquired control of Priscilla by purchase of a majority of its stock.

■ Plaintiff corporation contends that apart from the prospective tax benefits to be derived from application of Priscilla's losses to the consolidated returns, it had other substantial business reasons for the acquisition of Priscilla. Basically the important one, if it could be shown, is that Collins believed, as Seaman apparently did, that Priscilla could be restored to profitable operations and acquired the corporation for that purpose. On the evidence it cannot be found that this was the fact. Priscilla was running at a loss. The textile business generally was in a depressed state in New England. Seaman in the course of several months had not been able to induce anyone else to take any serious interest in the possible rehabilitation of Priscilla. Collins had no experience with operating a yarn mill. He was nearing retirement age and on his own testimony within a year or two thereafter was seeking to simplify the operations of his business. The subsequent events do not show there was any real intention on the part of Collins as of March 24 to make any real effort to restore Priscilla to profitable operation. Even under Seaman's optimistic view this would require extensive changes in Priscilla's business methods. Collins himself would not say that there was even a fair chance of producing a profit within four months of operation, yet within two months the decision to liquidate had been made. It seems clear that Collins had no serious expectation of restoring Priscilla to profitable operation in its yarn business and that this was not the purpose which motivated the acquisition.

Other suggested business purposes, such as the possibility of increasing plaintiff corporation's business through

top sales to Priscilla or the acquisition of market information through control of a company engaged in manufacturing operations, are merely incidental benefits which might have accompanied a successful operation of Priscilla. Standing alone they would not be of sufficient importance to explain the acquisition of an unsuccessfully operating subsidiary. Moreover, while Priscilla had at one time been a substantial buyer of wool from the Collins corporations, it had changed to the manufacture of yarns from synthetic materials and was no longer a prospective customer for wool.

Plaintiff corporation points to the fact that it was foreseeable that liquidation of Priscilla's plant and machinery would be a profitable operation and urges that this prospect of profit apart from tax benefits was a sufficient business reason for acquiring the stock of Priscilla. It is true that in fact, after the liquidation, Priscilla had a net worth in cash or liquid assets of $269,476.86, while plaintiff corporation had paid a total of $161,-668.22. Thus, apart from any tax benefits to be derived from the acquisition, it was clearly a profitable one. However, the very liquidation which in this aspect proved so profitable also resulted in the realization of $150,000 in tax losses. And the total tax reduction to be achieved by the Collins corporations if all these losses could be utilized would be between $120,000 and $216,000, depending on which tax bracket the taxpayer was in for 1954 and later years. No doubt the acquisition was motivated in part by the prospect of being able to liquidate Priscilla's assets, but the more important motive was undoubtedly supplied by the prospectively larger benefits to be derived from utilization of the tax losses.

■ The principal purpose of plaintiff corporation in acquiring the stock of Priscilla was thus the substantial tax benefit to be derived from utilization of Priscilla's past and prospective losses, and plaintiff is therefore not entitled to use these losses to offset the profits of the other corporations in the affiliated group in its consolidated tax return for 1954.

Priscilla had a total of $222,935.54 of operating losses for 1953 and for 1954 previous to May 21. As to these losses, together with $169,004.51 of losses incurred after May 21, 1954, and not claimed in the 1954 consolidated return as an offset to the income of the other corporations, plaintiff contends it should be allowed to carry them forward to be utilized on the consolidated returns for the fiscal year ending August 31, 1955, and subsequent years as an offset to taxable income of Priscilla (renamed Collins Wool Corporation) for those years. The Commissioner disallowed this claim except as to certain investment income of Priscilla.

■ Section 122 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 122, which allows the carry-forward of operating losses to be applied against income of future years, has been interpreted to apply only to the situation where there is a continuity of business enterprise, not in the sense of the continuance of the same technical corporate entity, but in the sense that the losses can be carried forward to be applied only against the earnings of a corporation engaged in substantially the same business in which the loss was incurred. Libson Shops, Inc. v. Koehler, 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed.2d 924; Mill Ridge Coal Company v. Patterson, 5 Cir., 264 F.2d 713. Here Priscilla before August 31, 1954, was engaged in the manufacture of yarn, and its losses arose out of that business activity. The earnings after that date against which it is claimed these losses should be offset arose from its operations under a new name in the entirely different business of wholesale dealings in wool and mohair.

Plaintiff relies on F. C. Donovan, Inc. v. United States, 1 Cir., 261 F.2d 470. In that case a corporation carried on a wholesale leather business while its subsidiary was engaged in distributing plastic sheeting. The corporations filed a consolidated tax return. The sub-

sidiary was merged into the parent corporation, which thereafter carried on both businesses in separate leather and plastic divisions. It was held that losses of the plastics division after the merger could be carried back against income of both the leather and plastic corporations for years preceding the merger. Before the merger the losses of one corporation could have been used to offset income of the other. Hence the merger had resulted only in a change of corporate form and not a change in the substantial nature of the business being done. The present case involves a corporation changing from one type of business to an entirely distinct type of business. The situation is thus not that of the Donovan case but much more like that in the Mill Ridge case, supra. This case involves also another feature found in the Mill Ridge case. As has been pointed out, what happened here was that after the acquisition of Priscilla its name was changed to make it the new Collins Wool Corporation, the old corporation of that name was dissolved, and the new corporation carried on the same wool and mohair wholesaling business that the old one had previously carried on. The only discernible motive for these changes is the hope that the profits of that business could be offset by the Priscilla losses if they were made by the new corporation. Hence under this aspect of the transaction the principal motive for the acquisition of Priscilla was to obtain the tax benefit of its losses, and under § 129 the carry-forward of these losses must be disallowed, as it was in Mill Ridge, supra, and in Commissioner of Internal Revenue v. British Motor Car Distributors, Ltd., 9 Cir., 278 F.2d 392.

### The Permar Stock Transaction

In 1954 the individual plaintiffs, Collins and his wife, owned all the stock of Permar Corporation, a Florida corporation whose principal business activity was the ownership and operation of an apartment hotel in Ft. Lauderdale. The corporation had been financed by issuance of 15,000 shares of stock at $1 a share (all ultimately acquired by Collins or his wife at that price) and borrowing $60,000 from Collins on a note. On September 1, 1954, the plaintiffs transferred their shares to R. P. Collins & Company, Inc. for $15,000 in cash. The corporation resold the stock to Collins on August 31, 1957, for $20,-843.75. The issue is whether the 1954 sale was, as plaintiffs contend, a sale of property at cost giving rise to no taxable income or whether, as government contends, by application of §§ 302 and 304 of the Internal Revenue Code of 1954, 26 U.S.C.A. §§ 302 and 304, the $15,000 was a distribution essentially equivalent to a dividend and hence taxable as ordinary income.

Plaintiffs agree that the transaction falls literally within the terms of § 304, which in substance provides that where the same persons own the controlling interests in two corporations, and in return for cash one of these corporations acquires stock in the other from the persons in control, the cash received by these persons shall be treated as a distribution in redemption of the stock of the corporation paying the money.

Since § 304 thus makes the payment a distribution in redemption of stock, the question of whether it is to be treated as an exchange, subject to capital gains treatment, or as a dividend to be treated as ordinary income, is determined by § 302, which in subsection (b) (1) excludes from treatment as an exchange a redemption "essentially equivalent to a dividend." The courts have interpreted that phrase as meaning "having the net effect of a dividend." Keefe v. Cote, 1 Cir., 213 F.2d 651. Hence the question here is whether the payment of the $15,000 to the taxpayers by the corporation had the net effect of a dividend.

The purpose of § 302 was to foreclose a method by which shareholders of a corporation could procure a distribution of the earnings of the corporation to themselves without becoming liable to a tax on the distribution as a dividend. Instead of declaring a dividend, the cor-

poration would redeem a proportional share of the stock of each shareholder at a price which would result in no taxable gain to the recipient. The net result would be that the shareholders received in cash a part of the earnings or surplus of the corporation without paying any tax and without changing their proportional interests in the corporation. Such a distribution was in substance a dividend and § 302 is designed to make it taxable as such. Similarly § 304 is designed to prevent tax avoidance in similar transactions where the owners of the stock of two corporations could secure a cash distribution from the earnings or profits of one by transferring to it shares of the other without changing their ultimate control of both corporations.

Government's position is that a distribution has the effect of a dividend when the corporation has earnings or profits available for distribution as dividends, the distribution is made pro rata to its stockholders, and the distribution is not connected with a partial liquidation of the assets of the corporation. The first and third of these conditions are concededly met in this case. As to the second there actually was not a pro rata distribution. Collins and his wife, who together owned 70 per cent of the stock of R. P. Collins & Company, Inc., received the whole $15,000. The holders of the remaining 30 per cent received nothing. Government points out, however, that under the constructive ownership provisions of § 318, 26 U.S.C. A. § 318, Mr. and Mrs. Collins must be regarded as owners of the 30 per cent of the stock owned by or owned in trust for the benefit of their daughters. Since § 302(c) (1) makes § 318 applicable for purposes of § 302, Mr. and Mrs. Collins must be regarded as constructively the owners of all the stock. Thus

technically all the conditions which the government considers necessary to constitute the payment a dividend are fulfilled.

■ The courts have, however, given consideration to other factors. There is no simple and precise formula to be applied to determine when a distribution is essentially a dividend. The best rule seems to be that it is a question of fact to be decided upon a consideration of all the relevant circumstances. United States v. Fewell, 5 Cir., 255 F.2d 496, and cases there cited, Ferro v. Commissioner of Internal Revenue, 3 Cir., 242 F.2d 838. Hence consideration should be given to other aspects of this transaction pointed out by plaintiff.

■■ A dividend essentially involves a distribution of earnings or profits of the corporation to its shareholders. It is necessary, of course, that there should be earnings or profits available for distribution, but it is also essential that these earnings or profits should have been distributed, and thus that there should have been an actual reduction of the corporation's surplus. Of course, the transaction should be carefully scrutinized, since it is possible to have it cast in such a form that the surplus is really reduced although it remains unchanged on paper. That, however, does not appear to be the situation here. The corporation received stock of Permar which was actually worth the $15,000 paid for it. It paid out $15,000 in cash but received assets worth at least $15,000. Conversely the individual shareholders received the cash but parted with property of equal value. Hence there was no real distribution to them of any of the earned surplus of the corporation and hence no dividend. Commissioner of Internal Revenue v. Pope, 1 Cir., 239 F.2d 881.[1] Moreover, as a

1. The Pope case is not strictly a precedent. It arose under the 1939 Code and did not purport to decide the meaning of § 115(g) of that Code, the predecessor of the present § 302, but rather the question of whether, apart from statutory provisions, the transaction involved was a genuine sale or a sham to cloak the distribution of a dividend. However, the facts of that case and the present one are similar and the basic question of what constitutes a genuine exchange as opposed to a dividend is the same.

result of the transaction the corporation had become involved, through the acquisition of a subsidiary, in a new line of business, that of operating an apartment hotel.

While the language in many of the cases indicates that the motives of the taxpayer are not a decisive factor, nevertheless some consideration has been given at times to the existence of a legitimate business motive for the transaction. Keefe v. Cote, 1 Cir., 213 F.2d 651, 657. Plaintiffs here argue that there was a business reason why R. P. Collins & Company, Inc., should own the stock of Permar because the operation of the hotel promoted contacts with wool men spending time in Florida with resultant benefit to the wool business of the corporation. It is true that this might make it appropriate for the corporation to acquire the Permar stock. However, the same benefits to the corporation might be derived while its principal stockholders owned the Permar stock. Hence while this factor supports plaintiffs' position, it cannot be given any great weight in determining the nature of the transaction here involved.

The courts in many cases have given some consideration to factors showing an intent to avoid taxes. Boyle v. Commissioner of Internal Revenue, 3 Cir., 187 F.2d 557. Such factors are not found here. There is no history of a failure of the corporation to pay dividends. From 1945 to 1954 the corporation paid out a total of $373,915 in dividends, taxable as such to its shareholders. In fact in two of those years it paid dividends well in excess of net profits after taxes for the year. Moreover, as plaintiffs point out, the substantial results of this transaction could have been obtained by other procedures resulting in no taxable income. For instance, Permar Corporation could have sold its assets to R. P. Collins & Company, Inc. for $15,000. The Collinses could then have dissolved Permar, receiving in liquidation the $15,000, with no taxable gain, since this was what they originally paid for their stock.

The conclusion in the light of all the factors is that the payment of the $15,000 to Mr. and Mrs. Collins in return for their transfer to the corporation of their Permar stock was not essentially equivalent to a dividend within the meaning of § 302.

### Casualty Loss Deduction

On August 21, 1954, R. Perry Collins entered into a contract to purchase from one Lopes a personal residence on Buzzard's Bay, Bourne, Massachusetts. Collins paid Lopes $100 and the remainder of the purchase price of $25,000 was to be paid at the time of conveyance, which was to be on or before September 15, 1954. The premises were to be delivered in their condition at the date of the agreement, excluding "reasonable use and wear of the building" and "damage by fire or other unavoidable casualty." It was also agreed that until full performance of the contract the building would "be kept insured in the sum of $20,000" by Lopes. Lopes did take out "fire and extended coverage" insurance on the property.

On August 31, 1954, a hurricane did extensive damage to the property, the total damage being estimated by Collins at $10,000 and by another witness as $6,000. Part of the damage was caused by wind, part by the abnormally high tide which accompanied the storm. On September 15, 1954, as a result of a new agreement between the parties, Collins paid Lopes $2,500 to be released from his contract to purchase the property.

Lopes filed claims with the insurance companies for the damage caused by the hurricane to the extent this was covered by the insurance. The extended coverage applied to wind damage, but not to that portion of the damage caused by flood and rising water. Eventually the companies paid Lopes $2,612 on these claims.

Plaintiff claims the right to deduct the $2,500 paid to Lopes as a casualty loss under § 165 of the Internal Revenue

Code of 1954, 26 U.S.C.A. § 165. There was clearly damage to the property here in excess of $2,500 which was not actually covered by insurance. The loss caused by hurricane is clearly one caused by storm under § 165(c) (3). Under the purchase agreement Collins had assumed the risk of loss to the property prior to actual passing of title. He therefore sustained the loss and is entitled to deduct it, I.T. 2150, IV-1 CB 147, 149, even though he did not have legal title to the property. If he had carried out his contract and paid $25,000 for the property, he would clearly have suffered a loss of between $6,000 and $10,000, less the $2,612 of insurance which was collected. What he did was to enter into a new agreement which in effect reduced his loss to $2,500. While in form it was a payment for a release from his contract obligations, in substance it was the loss which he incurred in the transaction as a result of the hurricane.

Under § 165 losses are deductible only when "not compensated for by insurance or otherwise." Admittedly Collins' loss here was not covered by insurance, but government argues that Lopes' failure to procure insurance which would cover all possible damage to the property was a breach of his agreement to insure, which gave Collins a right of action against Lopes to recover for the uninsured loss. Thus, government argues, the loss, though not compensated for by insurance, was compensated for "otherwise."

Government argues that Lopes' agreement to insure the property must be taken to mean he would insure it against every conceivable casualty. There was evidence in the deposition of the witness Day, a real estate and insurance broker who handled this transaction, that the fire and extended coverage procured by Lopes was the type of insurance normally procured in carrying out such contracts to insure, and that in many cases insurance against rising water and flood could not be procured. As to this particular property the most that Day would say was that he thought Lloyd's would probably write such insurance and probably at an annual premium of three fourths of the value of the property. Clearly insurance of this property against flood or rising water can scarcely be found to be included within the coverage intended by the parties when they agreed Lopes would insure the property.

Government further argues that in any case the basis for determining the loss must be the cost of the property, 26 U.S.C.A. §§ 165(b), 1011 and 1012, 26 U.S.C.A. §§ 165(b), 1011, 1012, and since Collins paid only a $100 deposit on the selling price prior to the hurricane, his loss must be limited to that amount. While this is the rule where there is a loss of property owned by the taxpayer, it cannot realistically be applied in a case where, as here, the taxpayer is not the legal owner, and has paid no substantial part of the agreed price, but nevertheless is the party upon whom the loss falls. In I.T. 2150, supra, a more realistic basis was approved in an analogous case i. e. the loss suffered by a corporation when securities of another held by it as bailee were embezzled was held to be the difference between the cost of replacing the securities and what it could obtain by way of compensation from insurance companies or from the property of the embezzler. Similarly the loss suffered by one who assumes the risk of damage to real property he is under contract to buy should be the difference in value between the property as he actually received it and the value it would have had if it had not been damaged. Here, of course, the taxpayer has extricated himself from the situation at an actual out-of-pocket loss in a lesser amount. He should be entitled to recover his actual loss.

Judgment in each case will be entered for plaintiff or plaintiffs, the amount to be computed in accordance with the holdings of this opinion and the stipulations of the parties as to certain counts.