**UNITED STATES of America,
Defendant, Appellant,**

v.

**R. Perry COLLINS et al., Plaintiffs,
Appellees (two cases).**

**Nos. 5885, 5895.**

United States Court of Appeals
First Circuit.

Heard March 5, 1962.

Decided April 2, 1962.

Melvyn I. Mark, Atty., Dept. of Justice, with whom Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, A. P. Prescott, and L. W. Post, Attys., Dept. of Jus-

tice, W. Arthur Garrity, Jr., U. S. Atty. and William C. Madden, Asst. U. S. Atty., were on brief, for appellant.

Roger P. Stokey, Boston, Mass., with whom Goodwin, Procter & Hoar, Boston, Mass., was on brief, for appellees.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

■ Number 5895 is an appeal by the United States of America from a judgment of the United States District Court for the District of Massachusetts entered on June 27, 1961 in favor of the taxpayers in a refund action to recover income taxes and interest alleged to have been illegally assessed and collected.[1] The sole question involved on this appeal is whether $15,000 in cash received by taxpayers in 1954 from R. P. Collins & Company, Inc. (a Massachusetts corporation), in exchange for all of the common stock of the Permar Corporation (a Florida corporation) was taxable as ordinary income, as a distribution essentially equivalent to a dividend under Sections 304, 302 and related sections of the Internal Revenue Code of 1954, 26 U.S.C.A. §§ 302, 304.

In 1954 the taxpayers, R. Perry Collins and his wife Marjorie C. Collins owned the entire stock (15,000 shares) of the Permar Corporation (hereinafter called "Permar"). Permar's principal business activity was the ownership and operation of an apartment hotel in Ft. Lauderdale, Florida. Permar had been financed by the issuance of 15,000 shares at $1 a share (all ultimately acquired by taxpayers at that price) and by borrowing $60,000 from Collins on a note. On September 1, 1954, the taxpayers transferred their shares to R. P. Collins & Company, Inc. (hereinafter called the Collins Company), for $15,000 in cash.[2]

On the date of this transfer the book value of the Permar stock was $12,884.07. On the same date Collins transferred Permar's note having an unpaid principal balance of $55,000 to the Collins Company for $55,000. At this time the Collins Company had an earned surplus of some $523,000. The taxpayers owned 70 per cent of its stock, the remaining 30 per cent was owned by or in trust for the benefit of their daughters.

On their income tax return for the relevant year taxpayers treated this transaction as a sale of property at cost giving rise to no taxable income. The government disputed this treatment contending that the $15,000 was a distribution essentially equivalent to a dividend and, consequently, taxable as ordinary income. Taxpayers paid the additional assessments and brought this action for a refund.

■ The government's position in this case is predicated on the application of Sections 304 and 302 of the 1954 Code. Section 304 was enacted in the 1954 Code to close loopholes in the tax laws deriving from transactions involving "brother-sister corporations." This involves situations where one or more individuals are in effective control of each of two corporations, and one of the corporations acquires stock of the other corporation. Section 304 provides that if (a) two corporations are controlled by the same persons, and (b) one of the corporations acquires stock in the other corporation which is owned by the person in control, the purchase is then defined as a redemption. Thereafter, Section 302 provides that such a redemption shall be treated as an exchange (and taxed at capital gains rates) if the distribution is not essentially equivalent to a dividend. If, however, the distribution is essentially equivalent to a dividend, then the distribution is taxable at ordinary income rates under

1. Number 5885 is an appeal from the opinion of the court below filed on April 10, 1961. That appeal will be dismissed for lack of jurisdiction. See In re Forstner Chain Corp., 177 F.2d 572 (C.A.1, 1949).

2. In 1957 the Collins Company resold the Permar stock to R. Perry Collins for $20,843.75 representing the book value of its net assets at that time.

Sections 301 and 316 of the Internal Revenue Code, 26 U.S.C.A. §§ 301, 316.

From the outset taxpayers have conceded that the transaction falls within the purview of Section 304—that Permar and the Collins Company are "brother and sister" corporations within the meaning of the Code. Thus, turning to Section 302 the question which must be answered is whether the $15,000 which flowed from the Collins Company to the taxpayers, in exchange for the Permar stock, more closely resembled payment deriving from the sale of stock in an arm's length bargain or more closely resembled the receipt of a dividend. Bradbury v. Commissioner of Internal Revenue, 298 F.2d 111 (1 Cir.), decided January 15, 1962.

In the district court the government argued that a distribution has the effect of a dividend when the corporation has earnings or profits available for distribution as dividends, the distribution is made *pro rata* to its stockholders, and the distribution is not made incident to a partial liquidation. The court agreed that "technically all the conditions which the government considers necessary to constitute the payment a dividend are fulfilled." 193 F.Supp. 602, 608. Thus the court recognized that at the time of the instant transaction the Collins Company had an earned surplus of over a half million dollars available for distribution; that the distribution was made *pro rata* to the stockholders (since under the attribution rules of Section 318 of the Code, 26 U.S.C.A. § 318, Mr. and Mrs. Collins must be regarded as owners of the stock owned by or in trust for their daughters); and that the distribution was not connected with a partial liquidation or contraction of the business.

However, the lower court went on to apply the so-called "net effect" test in determining dividend equivalency and after considering a number of additional factors, to be discussed below, reached the conclusion that the payment of the $15,000 to Mr. and Mrs. Collins in return for the transfer of their Permar stock to the Collins Company was not essentially equivalent to a dividend within the meaning of Section 302.

In its enumeration of the countervailing considerations to dividend equivalence the district court, after noting the initial necessity of a corporation having earnings or profits available for distribution before Section 302 would be applicable, stated: "but it is also essential that these earnings or profits should have been distributed, and thus that there should have been an actual reduction of the corporation's surplus." In concluding that the transaction had produced no reduction in surplus so far as the Collins Company was concerned, the court stated: "The corporation received stock of Permar which was actually worth the $15,000 paid for it. It paid out $15,000 in cash but received assets worth at least $15,000. Conversely the individual shareholders received the cash but parted with property of equal value. Hence there was no real distribution to them of any of the earned surplus of the corporation and hence no dividend." 193 F. Supp. 602 at 608.

In effect the court held that Section 302 and Section 304 were inapplicable where the stockholders' sale to the corporation was at a fair price or at fair market value.[3]

We believe that the district judge's emphasis on the fair market

---

**3.** Although recognizing that the case was "not strictly a precedent" the district court cited our decision in Commissioner of Internal Revenue v. Pope, 1 Cir., 239 F.2d 881 (1956), in support of its result. In the Pope case, on facts similar to those involved here, we held that the transfer of stock there involved constituted a real and not spurious "sale" and that the proceeds should be taxed as

capital gains and not as a dividend. However, this decision was based on the law as it stood prior to the enactment of Section 304 of the Internal Revenue Code and when there was no statutory basis for reaching intramural transfers between "controlled" corporations. Section 304 was added to the Code to foreclose just such a result as obtained in Pope and any reliance which the dis-

value of the transferred stock and on whether the transfer produced a reduction of surplus in the acquiring corporation was misplaced. If a taxpayer owns the entire stock of two corporations and sells his stock in corporation "A" to corporation "B" (extracting cash or property in the process), the economic consequences to the taxpayer are no different than if corporation "B" (the acquiring corporation) had distributed property to him without requiring the surrender of stock, except for the fact (usually devoid of practical consequences) that corporation "B" now holds the stock of corporation "A". See, Bittker, Federal Income Taxation of Corporations and Shareholders (1959), p. 235. Since this is the situation which Section 304 and Section 302 were designed to reach, the question of the "fair price" of the subject stock and its residual impact on the surplus account of the acquiring corporation are of little real significance. Indeed, in this situation, since the taxpayer can control the matter, so long as he insures that the payment for the stock does not exceed fair market value, it would be unusual for the acquiring corporation ever to have a reduction of surplus unless the acquired stock was retired.

However, it is to be noted that Section 317(b) of the 1954 Code, 26 U.S.C.A. § 317(b) expressly provides that for purposes of the tax, stock shall be regarded as redeemed by a corporation if the corporation acquires its stock from a shareholder in exchange for property, whether or not the stock so acquired is cancelled, retired, or held as treasury stock.

Moreover, this identical issue was raised in the case of Radnitz v. United States, 187 F.Supp. 952 (D.C.S.D.N.Y. 1960), aff'd per curiam, 294 F.2d 577 (2 Cir. 1961), where in a similar case it was held that Section 304 of the Code would be applicable even where the sale of stock to the corporation was made at fair market value. In that case the district court stated:

"Plaintiffs urge the court that Congress sought merely to prevent those distributions which reduced corporate assets from escaping dividend equivalence liability; that since Tylon received assets it did not previously own, viz., stock in New Jersey Turner Hall, in return for the cash payments made to plaintiffs and others, no corporate assets of Tylon were depleted. However, to subscribe to these contentions would serve to frustrate the corporate tax policy exemplified by the inclusion of Section 304 in the 1954 Internal Revenue Code and to impute to Congress a limited purpose therein unwarranted by the terms of the Code or its legislative background." 187 F.Supp. 952, 959.

We are in accord with this reasoning and agree with the government that the vitality of Section 304 ought not to depend for its effectiveness upon whether the stock was transferred at fair market value. Rather we believe that Section 304 was clearly oriented to embrace a situation like the present case. Moreover, it may be pointed out, in the instant case, that although the surplus of the acquiring corporation was not technically reduced, the consolidated assets of the two corporations were in fact reduced by the $15,000 which had flowed to the taxpayers who owned both corporations and, who when the transaction was completed, retained the same proportionate interest in the combined assets as had obtained before the exchange. Again, in the language of Radnitz:

"After the dust has settled, one finds the plaintiffs and their fellow stockholders as firmly ensconced in their tri-corporate positions as was true prior to the stock transaction, with admittedly no true dimunition of interest or control, despite their

trict court placed upon Pope was misplaced. Cf. Bittker, Federal Income, Estate and Gift Taxation, 2nd Ed. (1958), p. 526.

transfers of stock." 187 F.Supp. 952, 958.

The next factor which the lower court relied on as negating dividend equivalency was that through the transaction, the Collins Company became involved in a new line of business activity—that of operating an apartment hotel. Under the facts of this case we perceive no logical relevancy between the expansion of the business of Collins, Inc. via the acquisition of the apartment hotel and the question of dividend equivalency. Moreover, it may be noted that those cases which have considered the resultant scope of corporate activity following a transfer of stock from shareholders to the corporation as bearing on dividend equivalency have universally stressed the narrowing of the corporate activity or a contraction of the business rather than an expansion. See, e. g., Commissioner of Internal Revenue v. Champion, 78 F.2d 513 (6 Cir. 1935); Commissioner of Internal Revenue v. Babson, 70 F.2d 304 (7 Cir. 1934); Joseph W. Imler, 11 T.C. 836 (1948).

A further factor discussed by the district court in its application of the "net effect" test was the question of whether the transfer from Permar to the Collins Company was actuated by a legitimate business purpose. Taxpayers argue that the apartment hotel owned by Permar had become a winter gathering place for members of the "wool trade" in Florida. They argue that in effect the apartment hotel had become a "southern office" for the Collins Company which was engaged in the wholesale woolen business and this fact caused a resultant benefit to the Collins Company which made it more "equitable" that ownership reside in that company. The district court properly discounted this argument as adding any significant weight to taxpayers' position because, obviously, "the same benefits to the corporation [the Collins Company] might be derived while its principal stockholders owned the Permar stock." 193 F.Supp. 602, 609.

Further, in support of its conclusion of non-dividend equivalency the court cited the good previous history of the Collins Company in paying dividends. We recognize that some courts have accorded weight to past dividend history as bearing on the general proclivities of a corporation in regard to the accumulation of surplus. While such a factor may of course lend "atmosphere" to the particular transaction at issue, the fact remains that the question which must be resolved under Section 302 is whether the *particular distribution* then under judicial scrutiny is essentially equivalent to a dividend and on this question the former dividend history of the corporation can have but limited logical relevance.[4]

Finally, the district court accepted taxpayers' contention that "the substantial results of this transaction could have been obtained by other procedures resulting in no taxable income" as negating dividend equivalency. Such reasoning, however, overlooks the fact that once a taxpayer elects a particular mode of business procedure, he cannot avoid the statutory ramifications of his action by indicating results which might have obtained under alternate procedures. As the Court said in Gray v. Powell, 314 U.S. 402, 414, 62 S.Ct. 326, 86 L.Ed. 301 (1941): "The choice of disregarding a deliberately chosen arrangement for conducting business affairs does not lie with the creator of the plan." More significantly, however, the alternate ways which the taxpayers suggest could have accomplished the same "substantial results" would have required the liquidation of the Permar Corporation. Here so far as the record indicates, Permar was never

---

4. "Stockholders in a corporation with a spectacular record of dividends will be taxed under section 115(a) [the predecessor to Section 302] if the corporation adds another dividend to this excellent record. Why should stockholders of another corporation with an equally excellent record escape a tax under section 115 (g) merely because the distribution of earnings and profits is by way of a redemption?" Bittker and Redlich, Corporate Liquidations and the Income Tax, 5 Tax L.Rev. 437, 473 (1950).

liquidated. Consequently, we find taxpayers' arguments in this regard unpersuasive.

We recently had occasion to review at length the question of dividend equivalency in Bradbury v. Commissioner of Internal Revenue, supra. In that case the taxpayer was the dominant shareholder (owning 91.3 per cent of the outstanding stock) in a close corporation. The question was whether the cancellation of taxpayer's indebtedness to her own corporation and an additional credit to her account, upon the redemption of shares of stock which she held in that corporation was a distribution essentially equivalent to a dividend within the meaning of Section 302. In answering this question in the affirmative we used language which is pertinent here:

> "We believe that the indispensable first step in making this determination [of dividend equivalency] is whether the redemption of stock has caused a meaningful change in the position of the shareholder with relation to his corporation and the other shareholders.
>
> \* \* \* \* \* \*
>
> "It is obvious that where—subsequent to a distribution of property—there has been no real shift in intercorporate interest or no significant change in the economic interest of the parties involved, a proclivity towards dividend equivalence usually results.
>
> \* \* \* \* \* \*
>
> "The determination that a distribution in redemption has worked an essentially *pro rata* distribution and produced no material or significant shift in the corporate-shareholder relationship does not, of course, terminate inquiry into whether the transaction which produced these results was or was not essentially equivalent to a dividend. We simply say that in the hierarchy of criteria which may be adduced as evidentiary of this ultimate conclusion these factors must be accorded a preemi-

nent position. And, where they are present, the record must contain conspicuously countervailing considerations to dispel the aura of dividend equivalence which their presence irresistibly impels."

As in Bradbury we do not find these countervailing considerations present here and consequently upon a consideration of the entire record, we believe that the district court erred in not holding that the $15,000 received by taxpayers in 1954 from R. P. Collins & Company, Inc. in exchange for common stock of the Permar Corporation was taxable as ordinary income as a distribution essentially equivalent to a dividend.

A judgment will be entered in No. 5895 vacating the judgment of the district court and remanding the case with directions to recompute the tax and enter a new judgment accordingly.

In No. 5885 an order will be entered dismissing the appeal for lack of appellate jurisdiction.