**R. P. COLLINS & CO., Inc., Plaintiff, Appellant,**

v.

**UNITED STATES of America, Defendant, Appellee.**

**No. 5896.**

United States Court of Appeals
First Circuit.

May 14, 1962.

---

Roger P. Stokey, Boston, Mass., with whom Goodwin, Procter & Hoar, Boston, Mass., was on brief, for appellant.

Melvyn I. Mark, Atty., Dept. of Justice, with whom Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, and L. W. Post, Attys., Dept. of Justice, W. Arthur Garrity, Jr., U. S. Atty., and William C. Madden, Asst. U. S. Atty., were on brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is an appeal by the taxpayer, R. P. Collins & Co., Inc., a Massachusetts corporation, from a judgment of the United States District Court for the District of Massachusetts in favor of the government in a tax refund action growing out of a dispute as to the deductibility of certain losses incurred by a subsidiary of the taxpayer.

R. P. Collins & Co., Inc. (hereinafter called the taxpayer) was organized in 1934 and is engaged in the wholesale buying and selling of wool and mohair. In 1942 the Collins Wool Corporation, another Massachusetts corporation, was organized as a wholly owned subsidiary of the taxpayer and became engaged in a similar line of business as its parent corporation. Both corporations had a successful history of operation.

Priscilla Worsted Mills was a Rhode Island corporation which was organized in 1906 and whose principal business consisted in the manufacture of worsted yarns of various sizes. Priscilla had operated at a small profit in 1950, 1951 and 1952. In 1953 its operating loss amounted to $228,806 and during that year its principal stockholders decided to attempt to sell the business. However, one of Priscilla's minority stockholders—a David Seaman—believed that the outlook for the company was optimistic. He based this opinion on recent plant improvements and because he anticipated an upturn in the textile industry after the slump which it had suffered during 1953. His efforts to secure financing from banks or to persuade other mill owners to acquire the stock of Priscilla at $200 a share were unsuccessful.

In October, 1953 Seaman met with R. Perry Collins, the president, treasurer and dominant shareholder of the taxpayer to discuss taxpayer's possible acquisition of some Priscilla stock. At this time Collins was not interested in buying the stock. In January, 1954 Seaman again met with Collins and his attorneys. At this meeting, among other factors, they discussed the matter of Priscilla's operating losses and also the prospect of the substantial tax loss which might stem from a quick sale of Priscilla's assets. However, Collins still did not appear interested in acquiring an interest in Priscilla. Priscilla continued to sustain further losses in January and February, 1954. In February, after further consultation with his tax adviser, Collins offered to purchase the Priscilla stock at $175 a share subject to certain adjustments. This offer was accepted and an agreement for the purchase and sale of the stock was signed on March 1, 1954.

Incident to this agreement, on March 24, 1954, the taxpayer bought 800 shares and Collins Wool Corporation 400 shares

of Priscilla's common stock at $170.34 a share for a total price of $204,408. Seaman owned the only other stock of Priscilla which remained outstanding—a total of 200 shares. However, taxpayer held an option on Seaman's stock which it exercised on May 21, 1954, acquiring the remaining 200 shares for the price of $25,396.22. On March 30, 1954 Priscilla purchased from the Collins Wool Corporation 400 shares of Priscilla's stock at $170.34 a share. The net result of these activities was that after May 21, 1954 the 1,000 outstanding shares of Priscilla were all owned by the taxpayer.

Priscilla continued to sustain substantial operating losses after March 1, 1954 despite Seaman's efforts to improve production efficiency and reduce costs. Sometime prior to May 21, 1954 a decision was made to close the business. An agreement for the sale of Priscilla's plant and equipment at a price of $115,000 was negotiated in June and a sale was consummated in July, 1954.

Some months after this sale Priscilla became engaged in the business of wholesaling wool and mohair—the same line of business conducted by the taxpayer and its other subsidiary, Collins Wool Corporation.

The Priscilla corporation changed its name to Collins Wool Corporation on May 26, 1955 and on December 1, 1955 qualified to do business in Massachusetts. On August 31, 1955 the original Collins Wool Corporation was liquidated and dissolved. On August 31, 1957 the successor Collins Wool Corporation (formerly Priscilla) was liquidated and dissolved.

In its amended consolidated income tax return for the fiscal year ending August 31, 1954 the taxpayer utilized the post-affiliation (May 21, 1954) losses of Priscilla amounting to $193,067.13 to fully offset the total profit of both R. P. Collins & Co., Inc. and Collins Wool Corporation.[1]

In its consolidated return for the fiscal year ending August 31, 1955 the taxpayer claimed a net operating loss carry-forward of Priscilla in the amount of $222,-935.54 (the unused net operating loss of Priscilla for the year 1953 and the period before May 21, 1954) and $169,094.51 (the previously unused consolidated net operating loss carry-forward from the prior year which resulted from the inclusion of Priscilla's post-affiliation losses).

The Commissioner contested this treatment concluding that the principal purpose for the acquisition of Priscilla's stock was tax avoidance and that, therefore, Priscilla's losses for the period after May 21, 1954 could not be used to offset the income of the other corporations for the period ending August 31, 1954. The Commissioner also disallowed the attempt to carry forward to fiscal year 1955, except to the extent of certain investment income, the $222,935.54 of operating losses for 1953 and for 1954 prior to May 21. Consistent with his disallowance of the use of the Priscilla loss in the consolidated return for the fiscal year 1954, the Commissioner disallowed the $169,004.51 of losses incurred after May 21, 1954 and not claimed in the 1954 consolidated return.

The district court sustained the determinations of the Commissioner on these points and the taxpayer appeals to this court.[2]

The initial question which must be answered is what was the taxpayer's principal purpose in acquiring the Priscilla stock? Was this decision *primarily* actuated by legitimate business reasons, independent of tax ramifications, or was the moving force essentially a tax one? On the answers to these questions, the de-

1. These losses consisted of operating losses of $42,139.45 for the period from May 21 to the end of the fiscal year and capital losses of $150,927.67 stemming chiefly from the loss on the sale of Priscilla's plant and equipment.

2. On this appeal, contrary to its position below, taxpayer does not contest the decision of the district court in disallowing the $190,823.23 in Priscilla's pre-acquisition losses incurred before March 1, 1954, the date on which it became an 80 per cent owner of Priscilla.

ductibility of the instant losses will largely depend.

■ It now appears well settled that while Section 141[3] of the Internal Revenue Code of 1939, 26 U.S.C.A. § 141, permits affiliated corporations to file consolidated returns in proper cases, the advantage of filing such a return is not open to those corporations whose consolidation derived essentially from a desire to reduce or avoid taxation. See, Elko Realty Co. v. Commissioner, 29 T.C. 1012, aff'd Per Curiam, 260 F.2d 949 (3 Cir. 1958); see also, American Pipe & Steel Corp. v. Commissioner of Int. Rev., 243 F.2d 125 (9 Cir. 1957); J. D. & A. B. Spreckels Co. v. Commissioner, 41 B.T.A. 370 (1940).

In Elko, supra, a highly successful corporation acquired the entire stock of two other corporations which had operated and continued to operate at a loss. The Tax Court denied the acquiring corporation the right to use these losses on a consolidated return to offset its post-affiliation profits. In sustaining this determination the Court of Appeals for the Third Circuit concluded that "the two corporations were in any event not affiliates of the taxpayer privileged to join in a consolidated return under section 141 [of the 1939 Code] since the taxpayer's acquisition of them served no business purpose, as distinguished from a tax-reducing purpose." 3 Cir., 260 F.2d at 950.

Moreover, Section 129 of the Internal Revenue Code of 1939 and its successor, Section 269 of the 1954 Code expressly disallows deductions or other tax benefits in a situation where tax avoidance is the principal purpose for the acquisition of control over another corporation.

In the instant case, relying on both Sections 141 and 129 of the 1939 Code, the district court upheld the Commissioner's contention that tax avoidance was the principal purpose for taxpayer's acquisition of Priscilla and that, apart from this motive, there was no substantial business purpose for the transfer.

■ Whether or not an acquisition is for the principal purpose of tax evasion or avoidance is, of course, preeminently one of fact. Elko Realty Company v. Commissioner, supra. In its opinion (D.C. 193 F.Supp. 602 (1961)), the district court carefully reviewed and analyzed the evidence upon which it predicated its findings and this evidence need not be detailed here. We need only say that our own review of the entire record convinces us that the findings of the district court are based upon substantial evidence and cannot be held to be clearly erroneous. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.; Walling v. General Industries Co., 330 U.S. 545, 550, 67 S.Ct. 883, 91 L.Ed. 1088 (1947).

■ One aspect of taxpayer's argument on the question of the deductibility of losses on the fiscal 1954 return warrants comment. Between May 21, 1954 (the date on which taxpayer acquired sufficient stock ownership to become eligible to file a consolidated return) and August 31, 1954, Priscilla incurred $42,139.45 in operating losses. Taxpayer's argument proceeds on the basis that whatever might have been taxpayer's "overall" purpose in the acquisition of Priscilla, it assuredly was not a principal purpose to acquire operating losses during this relevant period. This argument is grounded on the reasoning that since a "loss" is worth at most no more than 52 per cent of its amount, no one would logically have a primary purpose of losing $1 in order to save at most 52 cents in taxes. Thus, goes the argument, it follows that no one would acquire a company with a principal purpose of losing $42,000 in order to acquire a tax saving which could not exceed $21,800.

---

3. Section 141 of the 1939 Code is controlling as to the fiscal year ending August 31, 1954, and Sections 1501–1505 of the Internal Revenue Code of 1954, 26 U.S.C.A. §§ 1501–1505, are controlling as to the year ending August 31, 1955.

The only substantial difference in the two sections is that under the 1939 Code the 95 per cent stock ownership requirement was reduced to an 80 per cent stock ownership requirement.

We find this argument unpersuasive because, on the facts of this case, it unrealistically attempts to segregate into isolated segments a course of conduct which is essentially unitary both in conception and in impact. Assuming, as taxpayer would have us do, that the court could conclude that the "overall" purpose of the acquisition was to avoid taxes, viz., to obtain the capital losses resulting from the sale of the plant and equipment, then we believe that it must have been within the fair contemplation of the taxpayer that certain operating losses would necessarily be incurred before this ultimate purpose could be effectuated and, to that extent, the operating losses would be included as a necessary incident of the "overall purpose." In effect once it is conceded that Priscilla was acquired with a view towards obtaining the tax advantages stemming from a corporate dismemberment, then we believe that all the losses which immediately precede this ultimate act are constituent elements of a course of conduct proscribed by Section 129. They are tarred by the same brush.

Thus, we believe that the district court was correct in holding that the principal purpose for the acquisition of Priscilla's stock was to avoid taxes and that consequently Priscilla's losses for the period after May 21, 1954 could not be used against the income of the other corporations for the period ending August 31, 1954.

We turn to the question of the correctness of the trial judge's ruling in regard to taxpayer's attempt to carry forward certain of the Priscilla losses to fiscal 1955.

The district court found that prior to August 31, 1954 Priscilla was engaged in the manufacture of yarn and that its losses stemmed from that activity. On the other hand, the earnings after that date against which it sought to offset these losses arose "from its operations under a new name in the entirely different business of wholesale dealings in wool and mohair." D.C. 193 F.Supp. at 606. Thereafter, based on this finding, which

is clearly supported by the record, the court held that Priscilla's operating losses for periods prior to the fiscal year ending August 31, 1955 could not be carried forward or utilized as an offset to the income for that year which was earned in the new business. In support of this action the district court relied, *inter alia,* on the decision of the Supreme Court in Libson Shops, Inc. v. Koehler, 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed.2d 924 (1957) and on Section 129 of the 1939 Code. Thus, the court stated:

"Section 122 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 122, which allows the carry-forward of operating losses to be applied against income of future years, has been interpreted to apply only to the situation where there is a continuity of business enterprise, not in the sense of the continuance of the same technical corporate entity, but in the sense that the losses can be carried forward to be applied only against the earnings of a corporation engaged in substantially the same business in which the loss was incurred." D.C. (193 F.Supp. at 606)

Taxpayer argues at length that the district judge's reliance on Libson shops was misplaced because in that case the losses which were sought to be carried forward were pre-consolidation losses whereas here the losses were incurred after the consolidation. In effect, taxpayer contends that the change of ownership of Priscilla resulting from the stock purchase agreement of March 1, 1954 precludes the application of the Libson rule to losses incurred after that date even though all of the losses were incurred in a different business from the one in which profits were subsequently realized.

On the present facts it is unnecessary for us to decide whether Libson Shops has application to pre-consolidation as well as post-consolidation losses because here the attempted carryover is clearly barred under the terms of Section 129.

Patently, taxpayer would not have had the opportunity to utilize the operating losses here at issue unless it had acquired the Priscilla stock. However, the district court found as a matter of fact that the principal purpose of this acquisition was tax avoidance. Since the clear purpose of Section 129 was aimed at inhibiting the acquisition of those corporations whose dominant lure lay in possession of certain tax characteristics and since this same section gave the Commissioner the power to disallow any "deduction, credit, or other allowance" which would not be enjoyed by the acquiring corporation in the absence of the acquisition, we believe these losses were properly disallowed. In sum, they were attributes which could be enjoyed by taxpayer only by contravening the statutory philosophy embodied in Section 129. See, C. I. R. v. British Motor Car Distributors, Ltd., 278 F.2d 392 (9 Cir. 1960); Mill Ridge Coal Co. v. Patterson, 264 F.2d 713 (5 Cir. 1959), cert. denied, 361 U.S. 816, 80 S.Ct. 57, 4 L.Ed.2d 63. Cf., American Pipe & Steel Corp. v. Commissioner of Int. Rev., 243 F.2d 125 (9 Cir. 1957); Coastal Oil Storage Co. v. Commissioner of Int. Rev., 242 F.2d 396 (4 Cir. 1957).

Judgment will be entered affirming the judgment of the district court, as modified by stipulation, approved by this Court.

ALDRICH, Circuit Judge (dissenting in part).

It seems to me that the court has painted with too broad a tar brush, obliterating some important distinctions.

There are the following significant dates. March 1, 1954, hereinafter "acquisition date," taxpayer contracted to buy 1200 of the 1400 outstanding shares of Priscilla, with an option as to the balance.[1] Shortly before May 21, 1954, taxpayer determined to sell Priscilla's plant and equipment. May 21, 1954, hereinafter "affiliation date," taxpayer exercised its option and acquired the balance of the Priscilla stock. June 25, 1954, taxpayer contracted to sell the assets, and on July 29, 1954, did so. In 1955 Priscilla engaged in a new, and profitable business. Hence we have three separate losses, with possibly varying consequences: Operating loss, March 1–May 21, post-acquisition, pre-affiliation, before it was determined to liquidate; operating loss, May 21–July 29, post-affiliation, after it was determined to liquidate; capital loss, July 29. Taxpayer could not claim the pre-affiliation operating loss on its consolidated return for the year ending August 31, 1954, see 1939 Code, § 141 (d), but it did there claim its post-affiliation operating loss. Also on this return it claimed the book loss on the sale of Priscilla's capital assets. In a subsequent return it sought to carry forward the March 1–May 21 operating loss and offset it against Priscilla's own later income. The court condemns, as unrealistic, taxpayer's attempts to segregate these losses and says they are essentially unitary, both in conception and in impact, and all part of a single "overall purpose." In the process of so doing I believe the court has made findings which the district court did not make, including one which it could not have made, and has, in addition, misconstrued the statute.

I can find no support for the court's statement that the taxpayer had a single overall purpose. The district court did not find that there was "no substantial business purpose for the transfer" apart from the tax motive. True, it found that the tax motive was the "principal purpose."[2] But it did not find, and could

---

1. The district court said that March 24, the date that papers passed, was the significant date. However, taxpayer became firmly obligated on March 1, and assumed losses from then, and I believe that date must control.

2. The apposite sections of the 1939 and 1954 Code (§§ 129 and 269, respectively) provide that if 50 per cent or more of the capital stock of a corporation is acquired for the "principal purpose * * * [of] evasion or avoidance of

not have found, that there were not, in addition, two substantial business purposes. The first of these was not even related to a tax loss, and the second was at least separable.

In spite of some attempt by the district court to gloss over the operating loss from March 1 to the date in May when taxpayer decided to liquidate, the evidence is uncontradicted that there was no intent to incur this loss even within the broad definition of necessary incurrence adopted by this court. On the contrary, Seaman risked—and lost—a considerable amount of his own money in the belief that, with the changes to be made and an expected market recovery, Priscilla could return to her former profitable ways. Collins, on behalf of the taxpayer, testified to the same thing, and risked the taxpayer's money to no other purpose. It is true that Collins was less optimistic, and said he proposed to give the matter only a short trial. But it is inescapable that taxpayer acquired Priscilla with no immediate intent to liquidate, but hopefully to operate, in which event none of the losses for which deductions are now sought would have been sustained. Taxpayer's initial purpose, in other words, was not only a business purpose, but was totally independent of any tax motive. It was an intent not to secure deductions, but to avoid them. Nor was this undesired loss "necessarily incurred" within the court's test "as a necessary incident to the overall purpose" of liquidating, because the initial purpose, not abandoned until May, was not to liquidate at all, and even on the basis of ultimate liquidation, this interim operation served no function.

I find no answer to this in the court's opinion, in the findings of the district court, or in the evidence were we to examine it de novo. To cut off all consideration of this unintended loss would go far beyond the policy of a statute designed to obviate tax-avoidance, and would constitute a penalty rather than a cure. Furthermore, it would go contrary to the statutory language itself. The only deductions struck down are "such" deductions, namely, the ones found to have motivated the acquisition. The statement in the government's brief that this first operation was with the "hope and desire to reduce taxation" is nonsense. The government's argument is really that taxpayer exercised poor business judgment in trying to operate successfully. Viewed after the event, this may be correct. But that is not the same thing as a hope and desire, or principal purpose to sustain a loss. To the contrary, it was a purpose not to.

On the assumption that taxpayer had an impermissible purpose of sustaining the built-in book loss upon the sale of the capital assets, a conclusion I agree with for reasons hereinafter discussed, I turn to the court's ruling that the operating loss incurred after the decision to liquidate is not deductible because it was "necessarily incurred" or a "necessary incident" to that overall purpose. I pass the fact that the district court made no such finding. I am willing to assume it to be so, to the extent that this activity was a necessary incident to an orderly liquidation in the sense that anything else would have involved an even greater loss. My difficulty is in seeing why it is to be charged against taxpayer's intent to secure the impermissible book loss. This operating loss was incurred as a necessary expense in connection with realizing the cash value of the assets pursuant to taxpayer's co-existing purpose to make a cash profit quite apart from any tax benefit. The record shows that taxpayer realized $115,000 from the sale of the assets. If it had incurred expenses, such as an auctioneer's fee, in connection with the sale, would it be contended that such expenses, since necessary, were impermissibly intended and could not be deducted?

I think the court fundamentally misconstrues the statute, carrying on, in an-

Federal income * * * tax by securing the benefit of a deduction, credit, or other allowance which such person or corpora-

tion would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed."

other fashion, the penalty notion previously referred to. I believe the purpose of the statute is to frustrate a motive of acquiring built-in losses, to which taxpayer was a stranger, by striking down "such" losses. The purpose cannot be to prevent profitable transactions in liquidatable corporations so long as such tax benefits are eliminated, or to tar and feather the taxpayer if he attempts them. Making money requires expenditures. The court now strikes down actually incurred expenses, which would normally be allowed, because it finds that taxpayer wished to realize certain tax benefits in addition to the cash profit.

I find in the statute no such broad proscription. I believe the phrase "deduction, credit, or other allowance which such person or corporation would not otherwise enjoy" means allowances artificial to the taxpayer, not losses actually incurred by it. On this subject the legislative history is illuminating. This statute was originally enacted in 1944, and has had no material change. The Senate Report stated that the aim was to prevent "perverting deductions * * * so that they no longer bear a reasonable business relationship to the interests or enterprises which produced them and for the benefit of which they were provided." Sen.Rep. No. 627, 78th Cong., 1st Sess. 58 (1943). The House expressed a similar objective, to prevent "reduction through artifice." H.R.Rep. No. 871, 78th Cong., 1st Sess. 49 (1943). I do not think actually incurred operating losses fall under either description.[3]

Turning to the questions involved in the capital loss, taxpayer has two points. The first, already adverted to, is that the original acquisition was not made with the initial intent of liquidating so that the realization of the capital loss could not have been the principal purpose. I would agree with taxpayer that if in March there had been no thought of liquidation at any time this point might be well taken. However, the fact is that taxpayer really had two intentions. The one was to operate, but not too hopefully; the other was to liquidate in fairly short order if that hope was not realized. It seems to me that under these circumstances the second intent may be regarded as ambulatory. When it became fixed and the alternative discarded, the discard should be for all purposes. I would treat the first, tentative period as an interregnum, and look to the taxpayer's alternative motive as of the day he finally selected it.

Even on this ambulatory basis taxpayer criticizes the finding of the district court that the realization of the capital loss was the "principal purpose" of the acquisition. It points to the fact, the evidence of which need not be recited, that it paid initially (and again, when it exercised its option for the remainder) very considerably less than liquidating value for the Priscilla stock, and stood to make a sizable profit on liquidation quite apart from any tax losses. The district court so found, and it seems to me beyond debate. This again answers to my satisfaction this court's statement that there was no substantial business purpose in the transfer apart from taxes. The district court disposed of this point in a different manner. It stated, "No doubt the acquisition was motivated in part by the prospect of being able to liquidate Priscilla's assets, but the more important motive was un-

---

3. Assuming my interpretation is correct on these matters, taxpayer has further problems with respect both to consolidated returns and to the effect of Libson Shops, Inc. v. Koehler, 1957, 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed.2d 924. Under the present circumstances there is no point in my reaching them. But I might observe that I seriously question the correctness of the district court's handling of Libson Shops. The subsequent lower court cases which have been decided against taxpayers involved a change of ownership of the company along with the change in business. It would be one thing to prevent trading in tax losses by preventing a new party from acquiring a built-in tax loss for a new business, but something else to say that a taxpayer who has himself incurred a bona fide loss must lose the deduction if he changes the nature of his business.

doubtedly supplied by the prospectively larger benefits to be derived from utilization of the tax losses."

It is not clear to me on what basis the court said "undoubtedly." It must be equally undoubted that this was an excellent financial transaction even if all tax benefits were disregarded. Furthermore, it seems clear that on the state of the law in March 1954 the realization of these tax benefits, even if liquidation occurred, was anything but certain. It is true that taxpayer was aware of the possibility, but there was no evidence that its decision to purchase in any way hung on that question. And would the court's ultimate decision have been different if instead of the book loss, if realizable, exceeding the cash profit, the figures had been reversed?

I do not think these cases should rest on what constitutes the apparently "larger" benefit in such a connection. Rather, it seems to me that regardless of what particular aspect of liquidation might be thought by a court to weigh more heavily in a taxpayer's mind, liquidation is a single, unitary transaction, and a taxpayer should not be found to "purpose" one feature apart from another. If the principal purpose is liquidation, and liquidation involves the realization of a loss which is artificial to the taxpayer, then the realization of that loss is part of the purpose and must be condemned, and this even if the "larger" benefit might be thought to be the cash profit. That is, on this matter I go not less far than the court, but further. In interpreting this statute we should be guided by Congress when it observed at the outset that the phraseology must be general and read in the light of its purpose. "[S]pecific description tends to center attention upon the form and technical character of the scheme, and to let the substance of the tax avoidance escape. To determine what transactions constitute the condemned evasion or avoidance, section 129 must be read in its context and background." Sen.Rep. No. 627, 78th Cong., 1st Sess. 60 (1943). I feel the court has looked only to the words.