NAETER BROTHERS PUBLISHING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 110–62. Filed April 2, 1964.

*Francis J. Sullivan* and *James C. Thompson*, for the petitioner.
*James H. Martin*, for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies in petitioner's income tax for the years 1956 and 1957 in the respective amounts of $7,417.59 and $14,935.40. The sole issue is whether petitioner, in its consolidated income tax returns for 1956 and 1957, may deduct losses incurred by a subsidiary corporation which petitioner acquired on January 1, 1955.

FINDINGS OF FACT

Some of the facts were stipulated and they are so found.

Naeter Brothers Publishing Co., hereinafter sometimes called the petitioner, was incorporated under the laws of Missouri in 1918. Petitioner's principal place of business is Cape Girardeau, Mo., and at all times herein material the petitioner was engaged in the business of publishing a daily newspaper, the Southeast Missourian, in the Cape Girardeau area. Naeter Brothers Realty Co., hereinafter sometimes called Realty, was incorporated under the laws of Missouri in 1924, and Missourian Printing and Stationery Co., hereinafter sometimes called Missourian, was incorporated under the laws of Missouri in 1920. The principal place of business of both Realty and Missourian is Cape Girardeau, Mo. During the years 1956 and 1957, and prior

1

thereto, Missourian was engaged in the business of job printing and the sale of office supplies and equipment.

Petitioner filed consolidated income tax returns for the years 1956 and 1957 with the district director of internal revenue for the district of St. Louis, Mo. Petitioner included Realty and Missourian in the consolidated returns for 1956 and 1957 as affiliated corporations.

On December 31, 1954, the outstanding capital stock of petitioner, Realty, and Missourian, was held as follows:

SHARES

|  | Petitioner | | Realty | | Missourian |
|---|---|---|---|---|---|
|  | Common | Preferred | Common | Preferred | Common |
| Fred Naeter | 181.5 | 60 | 15 | 15 | 128 |
| George Naeter | 181.5 | 60 | 15 | 70 | 126 |
| Petitioner |  |  | 200 | 15 |  |
| Nominees of Fred | 1 |  | 10 |  |  |
| Nominees of George | 1 |  | 10 |  | 2 |
| Others |  |  |  | 160 | 4 |
| Total shares | 365 | 120 | 250 | 260 | 260 |

As of December 31, 1954, Fred Naeter was president of both petitioner and Realty, and he was treasurer of Missourian; George Naeter, Fred's brother, was vice president and treasurer of both petitioner and Realty, and he was president of Missourian; Harry Naeter, nephew of both Fred and George, was vice president of Missourian. Fred and George were directors of all three corporations. In 1954 Fred and George were 80 and 85 years old, respectively. George died on November 10, 1956. Thereafter Fred became president of Missourian and Harry became vice president of Realty.

George's will had been executed by him on October 7, 1954, and it placed his entire estate in trust with provisions: (1) That the trust income be accumulated to enable Harry Naeter "to have sufficient funds to purchase the capital stock of Naeter Brothers Publishing Company, Naeter Brothers Realty Company and the Missourian Printing and Stationery Company that is provided for in the last will and testament of my brother, Fred W. Naeter, concerning his wife, Myrtle McPherron Naeter, and his daughter, Mary Louise Naeter, in the event that either or both of them decide to sell their respective shares of stock in any or all of the aforementioned corporations"; (2) that in the event Myrtle or Mary decided not to sell their stock, the trust will terminate and the principal and income turned over to Harry; and (3) that the trustees, during the life of the trust, should vote the stock of the three corporations to elect Myrtle, Mary, and Harry, among others, to the boards of directors of the three corporations.

In 1953 and 1954, and for some years prior to that, the actual management and operation of the petitioner corporation was in the hands

of Juel Mosley (managing editor), Alvin Macke (business manager), and S. P. Neal, an employee of petitioner for about 45 years, who handled petitioner's accounting matters. It was also Neal's duty over the years to make personal studies of the financial operations of Missourian. As of January 1, 1955, Neal participated in all the financial transactions and discussions involving petitioner, Realty, and Missourian. During the years 1955, 1956, and 1957 Neal and Mosley each received a salary of about $9,000 a year, while Macke received an annual salary of about $9,800 during this same period.

Fred, George, and Harry received the following salaries from petitioner, Realty, and Missourian during the years 1950 through 1957:

| Year | Fred Naeter | | George Naeter | | Harry Naeter | |
|---|---|---|---|---|---|---|
| | Petitioner | Missourian | Realty | Missourian | Petitioner | Missourian |
| 1950 | $20,631.70 | $4,136.37 | $13,031.70 | $4,136.37 | $5,015.70 | |
| 1951 | 20,600.00 | 4,028.00 | 13,000.00 | 4,028.00 | 5,480.00 | |
| 1952 | 20,400.00 | 4,140.00 | 12,800.00 | 4,140.00 | 4,016.00 | $1,625.00 |
| 1953 | 20,400.00 | 4,505.00 | 12,800.00 | 4,505.00 | | 9,109.00 |
| 1954 | 20,600.00 | 4,420.00 | 13,000.00 | 4,420.00 | 755.50 | 7,020.00 |
| 1955 | 20,420.00 | 4,420.00 | 12,800.00 | 4,420.00 | 1,509.40 | 7,040.00 |
| 1956 | 20,400.00 | 595.00 | 11,000.00 | 595.00 | 1,611.00 | 10,040.00 |
| 1957 | 25,000.00 | | | | 1,636.01 | 9,100.00 |

Harry also was voted a bonus of $3,000 by the board of directors of Missourian in December 1956 in recognition of the improvement in the operations of the corporation.

Missourian was indebted to petitioner and Realty as of December 31, 1953 through 1957, in the following amounts:

| Year | Petitioner | Realty |
|---|---|---|
| 1953 | $39,527.25 | |
| 1954 | 67,319.26 | $76,601.93 |
| 1955 | 104,813.02 | 124,149.93 |
| 1956 | 129,124.29 | 117,522.59 |
| 1957 | 121,514.80 | 110,599.33 |

Sometime in 1953 Neal consulted a firm of certified public accountants for the purpose of examining all aspects of the financial situation of the three corporations and other problems involving the corporate affairs. The accounting firm suggested that audits be made for each corporation and also suggested that consolidated balance sheets be prepared showing the combined assets and liabilities of the three corporations. A further recommendation made by the accounting firm was that Fred and George Naeter should transfer their stock in Missourian to the petitioner. The accounting firm prepared the corporation income tax returns of Missourian for 1953 and 1954.

On September 17, 1954, the Kansas City Life Insurance Co. executed a mortgage loan commitment in which it agreed to lend $250,000 to Realty. The terms of the loan called for interest of 4½ percent, with repayment of $50,000 in 10 years and the $200,000 portion of the loan in 20 years. The loan was to be secured by a first mortgage on the real estate and building owned by Realty at 301–311 Broadway, Cape Girardeau, Mo. Among other additional conditions for the loan listed in the commitment, the lender required (1) an assignment by Realty to the lender of two noncancelable 20-year leases (which were executed on October 11, 1954, by Realty as lessor and petitioner and Missourian, respectively, as lessees, for portions of the real property and buildings owned by Realty in Cape Girardeau) with sufficient rentals to amortize the loan and pay other expenses, and (2) copies of the annual audits of Realty, petitioner, and Missourian during the term of the loan. The 20-year terms of the two leases were to start on November 1, 1954.

At a special joint meeting of the boards of directors of petitioner and Missourian held on December 27, 1954, the following resolution was adopted:

Wherefore, in order to eliminate the inter-company indebtedness; to make possible the preparation and issuance of consolidated balance sheets and profit and loss statements, and to improve the financial position of the company to its outside creditors it is hereby agreed to accept on behalf of the Naeter Brothers Publishing Company as donated capital surplus all of the outstanding common capital stock of the Missourian Printing and Stationery Company presently owned by Fred W. Naeter and George A. Naeter, and that said stock be recorded on the books of the Naeter Brothers Publishing Company as of January 1, 1955 at the total par value thereof by charging "par value of stock in Missourian Printing and Stationery Company" and crediting "Donated—Capital Surplus."

During 1955 Missourian purchased new machinery, plant fixtures, mimeograph repair equipment, and silk screen equipment in the amount of approximately $80,000. In 1956 Missourian paid $8,011.42 for a detailed survey of its operations.

Missourian had operated at a net profit during the years from 1920 through 1952. During the years 1953 through 1957 Missourian operated at a loss. The operating losses of Missourian in each of the years 1953, 1954, 1956, and 1957 were attributable to its printing department, while in 1955 both of Missourian's departments (printing and merchandising) showed operating losses.

On October 18, 1957, Missourian entered into a contract to sell for $188,103.52 the machinery and equipment used in its printing operations as well as all of its printing work in process. Missourian reported a long-term capital gain of about $3,000 from the sale of this equipment in 1957. Missourian continued its merchandising operations in 1958, 1959, and 1960.

On December 27, 1957, Fred Naeter and petitioner executed an agreement under which petitioner agreed to purchase or redeem Fred's stock in the petitioner corporation in the event of Fred's death. The agreement stated, in part, that "the Stockholder [Fred Naeter] as the chief executive of the closely held Corporation [petitioner] is cognizant of the fact that his death may lead to a plethora of difficulties if he and his present chosen officers and employees have not made adequate plans for the future business and continuity of said Corporation, [and] that the surviving officers may find themselves in conflict with his widow, her possibility of insisting on participating in the management of said Corporation, thus presenting the surviving management with an inexperienced associate officer, director, etc."

Petitioner, Realty, and Missourian filed separate corporation income tax returns for 1953 and 1954 and reported the following amounts of taxable income or loss:

| Year | Petitioner | Realty | Missourian |
|---|---|---|---|
| 1953 | $17,042.28 | $6,956.72 | ($28,133.43) |
| 1954 | 2,972.22 | 3,544.26 | (23,014.53) |

Petitioner filed consolidated corporation income tax returns for 1955, 1956, and 1957 in which Realty and Missourian were included as affiliated corporations. The consolidated returns showed the following amounts of income or loss:

| | Separate income (or loss) | Contribution adjustment | |
|---|---|---|---|
| **1955** | | | |
| Petitioner | $25,829.70 | $2,065.00 | $27,894.70 |
| Realty | 2,435.25 | | 2,435.25 |
| Missourian | (39,149.93) | 282.50 | (38,867.43) |
| Consolidated loss | | | (8,537.48) |
| **1956** | | | |
| Petitioner | $20,884.57 | $2,000.00 | $22,884.57 |
| Realty | 1,664.17 | | 1,664.17 |
| Missourian | (29,014.27) | 125.00 | (28,889.27) |
| Consolidated loss | | | (4,340.53) |
| Net operating loss carry-forward from 1955 | | | (8,537.48) |
| Total consolidated loss | | | (12,878.01) |
| **1957** | | | |
| Petitioner | $34,790.92 | 3.00 | $34,793.92 |
| Realty | 10,024.36 | | 10,024.36 |
| Missourian | (25,390.71) | 167.50 | (25,223.21) |
| Consolidated income | | | 19,595.07 |
| Net operating loss carry-forward from 1955 and 1956 | | | (12,878.01) |
| Total consolidated income | | | 6,717.06 |

Petitioner, Realty, and Missourian filed separate corporation income tax returns for 1958 in which they reported taxable income of $10,235.78, $12,190.21, and $2,143.66, respectively. Missourian filed separate corporation income tax returns for 1959 and 1960 in which it reported taxable income of $8,027.35 and $14,905.99, respectively.

Respondent disallowed the losses attributable to Missourian in the consolidated income tax returns filed by petitioner in 1956 and 1957. Respondent's explanation for the disallowance in both years was: (1) Missourian was not affiliated with petitioner within the meaning of sections 1501–1504 of the Internal Revenue Code of 1954 because the acquisition of Missourian's stock by petitioner served no business purpose; and (2) that the principal purpose for which such acquisition was made by petitioner was the evasion or avoidance of Federal income tax by securing the benefit of deductions it would not otherwise enjoy and that the losses were disallowed under section 269 of the Internal Revenue Code of 1954. As a result of respondent's disallowance of these losses in 1956 and 1957, including the Missourian losses carried forward from 1955, and other adjustments, respondent computed petitioner's consolidated taxable income (petitioner and Realty) for 1956 and 1957 in the respective amounts of $23,270.30 and $43,505.82.

The principal purpose of petitioner's acquisition of the Missourian stock in January 1955 was not the evasion or avoidance of Federal income tax but was a bona fide business purpose.

### OPINION

As pointed out earlier, respondent disallowed the deductions attributable to the losses sustained by Missourian on two grounds. The first stated ground for respondent's disallowance was his determination that Missourian was not affiliated with petitioner "within the intendment of sections 1501–1504 * * * as the acquisition of the stock of Missourian * * * served no business purpose." The rule of a number of cases of this and other courts is that even though proper connection through stock ownership is shown, a business purpose must be shown for an affiliation before the acquired corporation can be treated as a member of the affiliated group. *J. D. & A. B. Spreckles Co.*, 41 B.T.A. 370; *Elko Realty Co.*, 29 T.C. 1012, affirmed per curiam 260 F. 2d 949; *R. P. Collins & Co.* v. *United States*, 303 F. 2d 142; *Zanesville Investment Co.*, 38 T.C. 406.

The second stated ground for respondent's disallowance of the deductions attributable to the losses sustained by Missourian was his determination "that the principal purpose for which such acquisition was made by [petitioner] is evasion or avoidance of Federal income tax by securing the benefit of deductions you would not otherwise enjoy"

within the provisions of section 269, I.R.C. 1954.[1]  The cited statute provides that if "any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed."  This statute has application with respect to postacquisition losses.  *Temple Square Mfg. Co.*, 36 T.C. 88; *R. P. Collins & Co.* v. *United States, supra; Elko Realty Co., supra; Zanesville Investment Co., supra.*  Since respondent's determination is presumptively correct, petitioner had the burden of showing the affiliation was to serve a business purpose and its principal purpose for acquiring Missourian stock was not the evasion or avoidance of income tax.

We are persuaded that the petitioner's acquisition of Missourian's stock on January 1, 1955, was motivated principally by business reasons.  This means petitioner met its burden on both grounds used by respondent as a basis for his determination.

After many years of profitable operations, Missourian in 1953 and 1954 began to show losses.  Neal, an employee of petitioner, testified that the managerial conditions of Missourian in 1953 and 1954 were "confused"; that conditions were changing in the printing industry; that the corporation's printing equipment was obsolete; that in 1952 Fred Naeter (who, with his brother George, controlled Missourian) delegated Harry Naeter to see what could be done about reequipping Missourian and modernizing its operations; and that it was felt that, especially since petitioner and Realty were, through substantial loans to Missourian, financing Missourian's losses, it would be advisable to place control of Missourian's financial and operational affairs in the hands of petitioner's experienced management group.

In 1953 Neal also sought advice from banking officials and an outside firm of business advisers in an effort to straighten out the financial difficulties brought about by the increasing drain by Missourian on the financial resources of petitioner and Realty.  Neal was advised that by affiliating the three corporations (petitioner, Missourian, and Realty) it would enable them to gather their assets in one group and would, by eliminating intercompany indebtedness and other intercompany transactions, present a more favorable financial picture for purposes of obtaining bank credit.  An insurance company which loaned Realty $250,000 in 1954 also requested consolidated balance sheets and profit and loss statements covering all three companies.

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

It is quite evident that the transfer of Missourian's stock to petitioner in January 1955 was done with these valid business reasons in mind. It can hardly be said that petitioner was acquiring a "shell" corporation, which is often a significant fact in these cases. As of January 1, 1955, it appears from financial statements in the record that Missourian had total assets of $335,719.30, liabilities of $194,073.85 (which included amounts due to petitioner and Realty of $67,319.26 and $76,601.93, respectively), and a net worth of $141,645.45 (including earned surplus of $115,645.45). There is good evidence in the record that the losses incurred by Missourian in 1953 and 1954 were deemed temporary, and good basis for such belief is indicated by the return to profit years in 1958. It is also significant that while the corporation showed total losses of about $28,000 and $23,000 in 1953 and 1954, the actual losses were due entirely to Missourian's printing division; the merchandising operations showed a net profit of $269.35 in 1953 and $7,697 in 1954.

During 1955 Missourian purchased new machinery, plant fixtures, and other equipment in the amount of about $80,000. In 1956 Missourian paid about $8,000 for a detailed survey of its operations by an outside company. Petitioner made further loans to Missourian in 1955 and 1956 of about $37,000 and $24,000, respectively, while Realty advanced about $47,500 to Missourian in 1955. During 1954 (the last preaffiliation year) the loss incurred by Missourian's printing division was about $29,000, while in the first 2 postaffiliation years, 1955 and 1956, the losses of the printing division were reduced to about $27,000 and $15,800, respectively. As for the merchandising division, it showed a net operating profit in 1956 of about $7,700, after a loss in 1955 of about $2,800. It was not until late in 1957 that Missourian, apparently despairing of any profitable operations in the printing division, sold the machinery, equipment, and work in process in its printing division for $188,103.52, reporting a long-term capital gain of approximately $3,000 from the sale in 1957. This evidence strongly supports petitioner's contention that Missourian was acquired in January 1955 for bona fide business purposes. It bears out that petitioner's purpose was to turn the printing division of Missourian into a profitable operation, and that this effort was abandoned only after it was proven futile. The merchandising division, however, was continued on an increasingly profitable basis, and the record shows that in 1961 Missourian earned a profit of about $16,000 from this division.

We cannot agree with respondent that the principal purpose of the acquisition in January 1955 was to evade or avoid tax. The purpose for the acquisition would probably be the anticipated consequences that would follow acquisition. *Army Times Sales Co.*, 35 T.C. 688, 704. We think the anticipated consequences were Missourian's con-

tinued operating losses for a short time to be followed by profitable operation. It can hardly be said this was not realistic for it is exactly what did happen. This would mean the principal purpose of the acquisition was not to evade or avoid tax for such an anticipated consequence would also be viewed in 1955 as likely to result in more taxes over a period of years.[2] Consolidation in 1955 increased the surtax rate by 2 percent and allowed for only one $25,000 surtax exemption in computing tax.

Since we have found that the principal purpose of petitioner's acquisition of Missourian in January 1955 was for a bona fide business purpose, it follows (1) that petitioner was entitled to file consolidated returns with Realty and Missourian in 1956 and 1957 within the meaning of sections 1501–1504; and (2) that section 269 is not applicable to the facts of this case. We hold for petitioner on this issue.

*Decision will be entered for the petitioner.*

[2] We attach no significance to the fact that petitioner filed consolidated returns in 1955–57 with Realty and Missourian and then caused separate returns to be filed by the three corporations in subsequent years. Once the election was made, respondent's regulation (sec. 1.502–11(a), Income Tax Regs.) required continued consolidated returns by the affiliated group in subsequent years. New tax legislation subsequent to 1955 brought with it the right to taxpayers who were on a consolidated basis to elect to change to separate returns. Petitioner merely availed itself in 1958 of this right which it could not possibly have foreseen in January 1955.