Kershaw Manufacturing Company, Inc. v. Commissioner.
Kershaw Mfg. Co. v. Commissioner
Docket No. 567-64.
United States Tax Court
T.C. Memo 1965-44; 1965 Tax Ct. Memo LEXIS 286; 24 T.C.M. (CCH) 228; T.C.M. (RIA) 65044; March 3, 1965
H. Cecil Kilpatrick, 912 American Security Bldg., Washington, D.C., and Fred S. Ball, Jr., for the petitioner. Ford P. Mitchell, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax for the fiscal years ended April 30, 1961 and 1962, in the *288 amounts of $153,696.77 and $110,504.32, respectively. One of the issues raised by the pleadings was conceded by respondent on brief, leaving for our decision the question of whether petitioner is entitled to deduct in its fiscal years ended April 30, 1961 and 1962, net operating losses sustained by the Turner Manufacturing Company during the calendar years 1956 through 1959 and the period July 1 to July 10, 1960, on which date that company was merged with petitioner. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner, a corporation with its principal offices in Montgomery, Alabama, filed its Federal income tax returns for the fiscal years ended April 30, 1961, and April 30, 1962, with the district director of internal revenue at Birmingham, Alabama. In 1947 petitioner was organized by Royce Kershaw (hereinafter referred to as Kershaw), who is its president and principal stockholder. Prior to the date of organization of petitioner, Kershaw had been engaged in business as a contractor doing railroad construction. Scarcity of labor in the years following World War II made it difficult for Kershaw to complete his construction contracts *289 on time. These difficulties caused him to work toward developing mechanical devices for doing much of the work in railroad construction. Kershaw first developed and patented a "Ballast Regulator" which enabled the work of equalizing the ballast on a railroad track to be done for a cost of less than $50 per mile as compared to a cost of 30 cents per foot when done by hand labor. Another machine developed and patented by Kershaw was a Cribber which was used to edge cross-ties in the construction of new railroads and to remove ballast between the ties. This substantially decreased the cost of this operation as compared to the cost of doing it by hand labor. Kershaw also developed and patented other machines useful in railroad construction. In all Kershaw had between 20 and 25 patents covering the machines he had developed. Petitioner was organized to build and sell the railroad machines covered by Kershaw's patents. During the years 1947 through 1952 petitioner's sales averaged approximately $90,000 a year, and thereafter were the following amounts for the years indicated: Year
Amount
1953
$ 404,174
1954
472,392
1955
987,934
1956
2,093,613
1957
2,177,191
1958
1,441,936
1959
2,388,622
1960
2,158,200
*290 During the years 1947 through 1952 petitioner had available manufacturing space in its Montgomery plant of approximately 3,500 square feet. During this period petitioner's machines were sold through agents. In 1953 petitioners commenced an aggressive sales program and began to demonstrate the machines it manufactured to the railroads. In 1953 the manufacturing space which petitioner was using was approximately twice that it had been using in 1952 and prior years, and in 1954 petitioner increased its available manufacturing floor space by approximately 20 percent over that available to it in 1953. On the basis of petitioner's estimate of the sales it expected to make in its fiscal year 1955, Kershaw was of the opinion that it needed 15,000 square feet of floor space, but its actual available floor space during 1955 was only 13,000 square feet. On the basis of petitioner's sales for its fiscal year ended June 30, 1956, Kershaw estimated that petitioner needed 30,000 square feet of floor space and petitioner had only 15,000 square feet of available manufacturing space at that time. During the year 1956 petitioner had operated on double shifts due to lack of adequate floor space, was *291 in some instances late in deliveries, and Kershaw felt that petitioner lost some business on this account. Kershaw's estimate of petitioner's expected sales for its fiscal year 1957 indicated a need for approximately 24,000 more square footage of floor space than petitioner then had at its Montgomery plant. It was Kershaw's estimate that an addition of 24,000 square feet of floor space to the Montgomery plant would cost approximately $200,000 and that the construction of such manufacturing space would take from 8 months to a year to complete. During 1955 Kershaw began to investigate the possibility of leasing manufacturing space with the thought of procuring the additional area needed without a substantial initial investment. It was Kershaw's opinion that because of the expansion of the company's operations, its available funds were needed for working capital. Kershaw first looked at several plants in the vicinity of Montgomery, Alabama, but did not find the type of space he needed in the Montgomery area. He then began looking at the advertisements in financial papers including the Wall Street Journal for business opportunities or plants for sale in order to investigate the possibility *292 of obtaining additional manufacturing space outside the Montgomery, Alabama area. Kershaw found a number of businesses offered for sale in the Wall Street Journal requiring cash investment in excess of the amount he was interested in paying in cash in order to acquire the needed additional manufacturing space. During the first part of 1956 Kershaw saw an advertisement in the Wall Street Journal stating that the Turner Manufacturing Company (hereinafter referred to as Turner) was for sale. Turner was a North Carolina corporation with its principal offices at Statesville, North Carolina. It had been engaged in the business of the manufacture of farm machinery and related products for approximately 50 years. Kershaw and other representatives of petitioner went to Statesville to investigate the type of facilities available at the Turner plant and also to determine the number of trained mechanics who were working in that plant. Kershaw and the other representatives of petitioner ascertained that there was machinery in the Turner plant such as sheet metal machines which could be used in the manufacture of petitioner's products and also that there were 30 trained mechanics working in the *293 Turner plant who had been with that company for 15 or 20 years including machinists and welders. Petitioner needed this type of trained mechanic to work on the production of its products. The Turner plant was served by the Southern Railway. This railroad was a customer of petitioner's, although Montgomery was not located on that railroad's line. Representatives of Southern Railway had indicated to petitioner that they would make more purchases from petitioner if petitioner's operations were located on its line. After Kershaw and other representatives of petitioner visited the Turner plant, they concluded that the actual net worth of Turner was in the neighborhood of $300,000 although Turner's last balance sheet showed a net worth of over $800,000. Turner's stockholders initially stated that they wanted $500,000 for their stock. Kershaw and other representatives of petitioner continued negotiations with the stockholders of Turner in an effort to obtain use of the Turner facilities without an initial cash investment. As a result of these negotiations on August 28, 1956, the following agreement was executed between Turner and petitioner: WHEREAS, Turner Manufacturing Company, a *294 North Carolina corporation with its principal office at Statesville in said state and hereinafter for brevity called Turner, has not been operating successfully, and its stockholders are desirous of making arrangements for new management by Kershaw Manufacturing Company, an Alabama corporation with its principal office in Montgomery in said state and hereinafter for brevity colled Kershaw, which has been operating successfully, and Kershaw is willing to assume the management and operation under the terms and conditions herein set out, NOW, THEREFORE, in consideration of the mutual agreements herein set out, the said corporations do hereby agree as follows: 1. Turner agrees to use its best efforts to promptly arrange for the holders of at least 85% or more of its total authorized capital stock to deposit their stock certificates with the First National Bank of Montgomery in escrow. Said certificates shall be endorsed to said Bank with the signatures duly witnessed and guaranteed by any bank which is a member of the Federal Reserve System. Together with said certificates shall likewise be deposited an instrument on form acceptable to Kershaw's attorney hereinafter named by which *295 each stockholder grants to Kershaw or its nominee, the option to purchase said stock at any time prior to January 1, 1961, provided all options are executed simultaneously, at the price per share to be compated by adding $2.875 to an amount equal to 1/80,000 of 15% of the total net profits after federal and state income taxes of Turner earned after Kershaw assumes the management and up until the time of the exercise of the option. There shall also be deposited with said bank an irrevocable proxy by each stockholder, which sall [shall] be construed as a power with an interest, authorizing and empowering the chief executive of Kershaw to exercise all voting privileges of said stock until December 31, 1961, except as herein provided, or until the option to purchase said stock has been exercised if that date is earlier. The parties are aware that under the present North Carolina law there is a limit to the length of time such a proxy may extend but that under a new statute which becomes effective in 1957 the limit is extended and the parties therefore agree that the new statute shall apply when it becomes effective. If the operation under Kershaw management results in a loss as computed *296 by the accountants hereinafter referred to for any two consecutive years, any stockholder shall have the right by written regular mail notice to the escrow agent to cancel his or her proxy and recover back his or her stock. The certificates, options and proxies so deposited shall be held by said bank as escrow agent and disposed of as follows: (a) If certificates representing at least 85% of the shares of stock of Turner, together with the options and proxies relating thereto have not been so deposited by January 1, 1957, the certificates, options and proxies which have been deposited up to that time, if any, shall be promptly returned by registered mail addressed to the respective owners of said stock at the address shown on the stock certificate and this agreement shall thereupon be of no further effect and in that event the fee of the escrow agent and its expense in holding and returning the stock certificates shall be paid by Kershaw and be promptly reimbursed by Turner upon request by Kershaw. (b) If and when all of said certificates, options and proxies have been so deposited the escrow agent shall immediately deliver the proxies to the chief executive of Kershaw and shall *297 hold said certificates and options in escrow subject to the option to purchase herein provided in favor of Kershaw. The expense and fee of the escrow agent shall be paid by Turner. 2. Turner shall, upon the execution of this instrument by its chief executive, promptly deposit with Fred Ball, attorney for Kershaw in Montgomery, Alabama, or such other attorney as Kershaw shall designate in writing, the following: (a) A complete abstract of title of all Turner real estate wherever located certified by a responsible attorney or abstract company showing a good and merchantable title free and clear of encumbrance or lien other than property taxes for the current year, railway rights of way and utility easements. (b) A certificate of a responsible attorney or abstract company showing that a search of the records of Iredell County, North Carolina, from a date at least ten years prior relating to personal property has been made and showing the full facts as to any and all unsatisfied conditional sale contracts, retention of title contracts, chattel mortgages and other liens on personal property of Turner. (c) The resignation of all of the present officers and all but two of the present *298 directors of Turner to be effective when 85% of the Turner stock has been deposited with said bank. (d) An agreement, on form acceptable to said attorney, by all Turner creditors other than banks, to a twenty month moratorium on their respective accounts or claims providing Turner pays them not less than 5% per month of the principal beginning on the last day of January 1957, with a ten day grace period and waiving all interest on the amounts so paid. The agreement by bank creditors [creditors] shall provide for a twelve month moratorium on the same basis with the agreement to extend for an additional eight months if permitted to do so by the banking laws or regulations applicable. (e) Evidence that the Turner by-laws already permit out of state directors meetings and if not, evidence that they have been amended so that directors meetings may be held outside of North Carolina. (f) Evidence that this contract has been ratified by the requisite number of stockholders to make it legally effective under North Carolina law. (g) Any other documents or information reasonably required by said attorney in connection with this agreement. 3. (a) As soon as the stock, proxies and *299 option provided for herein in paragraph 1 have been deposited with the said escrow agent and the items provided for in paragraph 2 herein have been deposited with said attorney, and the proxies have been delivered by said bank to Kershaw's chief executive, Kershaw agrees and obligates itself after appropriate corporate action has been taken under the proxies to elect new officers and three (3) new directors, and thereafter to elect and maintain on the Board of Directors two (2) members designated by a majority of stockholders and three (3) members by Kershaw, to assume the operation of the Turner business. (b) In the operation of the business of Turner under the new directors and officers Kershaw shall be under the obligation to exercise good faith but neigher [neither] it or the new officers or directors be personally responsible in any way to any party in the event Kershaw should not succeed in a successful operation. (c) Kershaw shall have the right to arrange with Turner under the direction of the new directors and officers for Turner to manufacture Kershaw railroad maintenance machines or such other machines or products it may deem advisable to manufacture and for Kershaw *300 to handle the sale of said machines and to apply such part of the proceeds of the sales to Turner for the manufacture and to itself for the sale, as may be approved by the new directors. (d) Kershaw will immediately lend Turner $10,000.00 in order to add that amount to Turner's working capital and said loan shall be evidenced by a demand note without interest prior to demand. 4. In the event Kershaw should elect to exercise the option at any time prior to the expiration thereof, notice of said election shall be given in writing either personally delivered or by notice by registered mail posted prior to January 1, 1961, to said bank accompanied by: (a) A statement certified by Crane, Jackson & Wilson or such other firm of certified public accountants who have prepared Turner's last federal income tax return showing the amount of the net income after taxes of Turner earned after January 1, 1957, and showing the price per share computed as provided in paragraph 1 hereof, and (b) Funds with which to pay for such stock at the price computed as shown in the said statement by the accountants. (c) The said bank as escrow agent is authorized to accept the said accountants computation *301 as correct and to thereupon deliver the stock certificates to Kershaw's chief executive and his receipt therefor shall be sufficient. The escrow agent shall thereupon remit the total amount so received, with a copy of the accountant's statement, to the stockholders at the address shown on the stock certificate and such remittance shall be in full discharge of the duties and responsibilities of the escrow agent. 5. Kershaw shall not be obligated to continue the management of Turner any longer than in the judgment of its chief executive the operation is successful or progress is being made towards a successful operation. 6. If Kershaw does not exercise said option by January 1, 1961, the escrow agent shall promptly forward said stock certificates by registered mail to the stockholders at the address shown on the stock certificate in full discharge of its responsibilities. 7. In the event Kershaw does not exercise said option, the three directors named by Kershaw and all officers shall promptly resign and Kershaw shall promptly release the management to such new directors and officers as are thereafter elected by the stockholders. 8. Full and complete records of Turner's operations *302 shall at all times be kept while Kershaw is managing its business and said records shall be available at all reasonable times to any director or stockholder. 9. This contract contains the entire agreement of the parties. IN WITNESS WHEREOF, the said parties have caused this instrument to be executed by their respective presidents and have caused their respective seals to be hereto affixed and attested on this August 28, 1956. At the time this agreement was executed, Turner's authorized capital stock was 200,000 shares of which only 80,000 were issued and outstanding. The agreement of August 28, 1956, was the only contract between petitioner and Turner with reference to petitioner's management of Turner's business. On August 17, 1956, Dun & Bradstreet, Inc., sent to its subscribers the following notice: The following letter dated August 14, 1956 was mailed to all creditors of Turner Manufacturing Co., Inc.: "Gentlemen: As you know, during the past several months, Turner Manufacturing Company, has been unable to meet its obligations currently with its banks and firms from whom it had purchased supplies and materials. Its sales of farm machinery sharply decreased during *303 the latter part of 1955 and 1956, and it lost its distributorship for several items which it had customarily resold at a profit. Its efforts in diversifying its products are materializing too slowly to generate adequate cash. This situation has given rise to many rumors. Consequently, we feel that you should be informed of what is the present situation. During the past months, the company has made vigorous efforts to interest some other party having a profitable business in acquiring a substantial interest in Turner Manufacturing Company, and supplying it with operating capital as well as other products which it could effeciently [efficiently] manufacture. These efforts have finally materialized in a proposal from a concern which has an established business of manufacturing and marketing products for which Turner Manufacturing Company is ideally adapted to make. The demand for these products is such that the concern has definite need for additional capacity immediately. An engagement has been made with officials of this company to meet with us during the week of August 20th at which time we will under take to negotiate the details of a contract. In the meanwhile, the current *304 position of Turner Manufacturing Company as of July 31, 1956 was 1.3:1.0 and our assets were of more than twice the total amount owed. We assure you that everything consistent with sound business judgment is being done to conserve the assets of the corporation to the end that all creditors may be treated fairly and fully paid. It may well take as long as two or three weeks to complete the negotiations of this contract. We shall certainly contact you just as soon as the proposal reaches a final form. We appreciate your continuing cooperation. Yours very truly, TURNER MFG. COMPANY, Turner A. Duncan, President. TAD/psl" Interviewed on August 16, 1956, William W. Rader, Comptroller, advised that a Board of Directors meeting was scheduled for August 17, 1956 to discuss the proposal of the undisclosed concern mentioned in the above letter. The form of option agreement referred to in the agreement of August 28, 1956, was as follows: THIS CONTRACT, made and entered into this the 19th day of September, 1956, by and between the undersigned stockholder of Turner Manufacturing Company, a North Carolina corporation, herein referred to as "Turner," party of the first part, and Kershaw *305 Manufacturing Company, an Alabama corporation with its principal office and place of business at Montgomery, Alabama, herein referred to as "Kershaw," party of the second part, WITNESSETH THAT, subject to the terms and conditions hereinafter stated, the undersigned, for and in consideration of the sum of One ($1.00) Dollar in hand paid, receipt of which is hereby acknowledged, hereby gives and grants unto said party of the second part, or its nominee, the exclusive rights and option to purchase from the undersigned shares of the common capital stock of Turner Manufacturing Company of the par value of Five ($5.00) Dollars per share evidenced by stock certificate Number heretofore issued by said company to the undersigned and now standing in the name of the undersigned on the books of said company. The terms and conditions of this option are as follows: 1. The purchase price per share of said stock is to be determined by adding $2.875 to an amount equal to 1/80,000 of 15% of the total net profits of Turner after federal and state income taxes earned after January 1, 1957, and up until the time of notice of intention to exercise the option. "Total net profits" shall be net income *306 as determined and certified to by Crane, Jackson & Wilson or such other firm of certified public accountants who made the last federal income tax return for Turner prior to the exercise of the option. 2. In the event of the exercise of this option by Kershaw, the purchase price shall be deposited with the escrow agent with whom the certificate or certificates of said stock are deposited and the stock shall thereupon be surrendered. 3. This option may be exercised and said stock purchased by the party of the second part or its nominee at any time to and including the 31st day of December, 1961, provided all other options held by the party of the second part for the purchases of Turner Manufacturing Company stock are exercised simultaneously with this option. 4. (a) The undersigned stockholder in Turner Manufacturing Company does hereby constitute and appoint the chief executive officer of Kershaw Manufacturing Company, or such other person as may be designated by the Board of Directors of Kershaw Manufacturing Company, as my true and lawful proxy for me and in my name and stead to receive and waive notice of and attend all meetings of the stockholders of said company, both regular *307 and special, held prior to December 31, 1961, and at all said meetings to cast all votes to which my said stock may be entitled upon all questions coming before said meetings. (b) This option shall be construed as a power with an interest and shall be irrevocable prior to December 31, 1961, except that this proxy shall be of no further effect in the event the option herein granted to purchase said stock has been exercised at an earlier date. In the event the operation of Turner Manufacturing Company as computed by the said accountants results in a loss for two consecutive years prior to December 31, 1961, the undersigned reserves the right to revoke this proxy. This proxy is absolute and without any limitation whatsoever, except that the holder hereof shall not be entitled to vote affirmatively for the issuance of any new stock without the unanimous vote of the entire Board of Directors of Turner Manufacturing Company. (c) The undersigned further agrees that, if, at any time during the term of this proxy, Kershaw should consider it necessary or desirable in order to make effective the power herein granted under any then existing laws of the State of North Carolina, the undersigned *308 will, immediately upon request of Kershaw, execute and deliver such new proxy or other instrument in writing, as Kershaw may deem necessary or desirable, to vote the stock of the undersigned as provided herein. The provisions of this paragraph of this contract shall be binding upon the heirs, assigns, successors and personal representatives of the undersigned and the perersonal [sic] representative of the undersigned is hereby authorized, empowered and directed to execute such new proxy or other documents in writing as may be required under the terms of this paragraph. 5. This option is executed and delivered pursuant to and in accordance with the terms of a certain contract entered into between Turner Manufacturing Company and Kershaw Manufacturing Company, dated August 28, 1956, in connection with which First National Bank of Montgomery is escrow agent, as to which the undersigned is fully informed and which the undersigned does hereby ratify, confirm and approve. IN WITNESS WHEREOF, the undersigned has hereunto set his hand and seal on the day first above written. (SEAL) Shortly after August 28, 1956, petitioner took over the control of Turner and, on November 9, 1956, elected *309 a majority of Turner's directors. The only cash outlay made by petitioner before taking over Turner's operations was a loan of $10,000 by petitioner to Turner to meet Turner's payroll obligations. Turner kept its records on a calendar year basis. For the calendar year 1954 Turner sustained a net operating loss of $541,333.66. For the calendar years 1952, 1953, and 1955 Turner had profits in the amounts of $226,533.03, $1,011.83, and $148,498.24, respectively. During negotiations between Kershaw and representatives of Turner prior to the execution of the agreement of August 28, 1956, Kershaw was informed of the loss sustained in 1954 by Turner, of the profit made by Turner in 1955, and that Turner's operations for its first quarter of 1956 had resulted in a loss. At the time petitioner and Turner executed the agreement of August 28, 1956, there were a number of lawsuits pending against Turner, and many of the machines which had been manufactured by Turner were being returned by the purchasers for further work and rebuilding. Kershaw had not investigated this aspect of Turner's operations and was not aware either of the lawsuits or of the machinery being returned prior to petitioner's *310 entering into the agreement with Turner. Kershaw had questioned one or two agents for Turner's machines as to the reputation of Turner and its machines in the farm machinery industry. After petitioner took over control of Turner's operations, it continued to manufacture some of the farm machinery previously manufactured by Turner. It made some changes in Turner's operational methods and in the price structure of Turner's farm machinery and other products. Among the farm machines which petitioner continued to manufacture were the peanut picker, the peanut harvester, tillaplow, and the Turner transplanter. In 1957 the manufacture and sale of the peanut picker was at a loss, but the manufacture and sale of this item was at a profit in 1958 and 1959. The peanut picker was a stationary machine to which the peanuts were carried. Petitioner found that the market for this machine was decreasing because of competition from combines. In 1957 under petitioner's management, Turner had neither a profit nor a loss on the manufacture and sale of the peanut harvester. Petitioner redesigned and repriced this machine. In 1958 Turner's sales of this item decreased to such an extent that even though *311 a profit was shown on the reduced volume of sales, petitioner decided that Turner should abandon the manufacture of this item. Prior to 1956 the peanut harvester had been one of Turner's major products, but in 1956 Turner brought out a new model which proved defective, and early in 1957 many of the new model machines were returned for adjustment and rebuilding which work was done at a cost of approximately $45,000. The tillaplow had been manufactured by Turner under contract with another company. The manufacture and sale of this product was at a profit in 1957 but Turner had received a cancellation of the contract for failure to fulfill its requirements prior to the time petitioner took over the operation of Turner. The Turner transplanter was manufactured by Turner under a license from another corporation, which other corporation had a contract with the holder of a patent. This machine was manufactured and sold at a profit in 1957, but during that year Turner received notice of a patent infringement. The company from whom Turner had a license requested Turner to defend the patent infringement claim, but petitioner refused to have Turner do so and entered into an agreement to sell *312 Turner's transplanter inventory. Some profit was shown on certain other items of farm machinery manufactured by Turner in 1957 and 1958, but in many instances volume dropped to such an extent after Petitioner made price increases on the machines that petitioner decided to have Turner drop the manufacture of these machines. Petitioner likewise decided to have Turner drop the manufacture of certain items other than farm machinery which it was attempting to develop and market when petitioner took over Turner's management because petitioner was of the opinion that the items were underpriced. There were other items other than farm machinery which petitioner continued to have Turner manufacture and on which profits were shown in 1958 and 1959, and on some of which profits were shown in 1957 as well as in 1958 and 1959. Petitioner turned over to Turner for manufacture a number of its orders for railroad machinery. The arrangement between petitioner and Turner was that Turner would manufacture these products and ship them directly to petitioner's customers under purchase orders obtained by petitioner. Petitioner would then bill the customer and petitioner would turn 85 percent of the *313 sales price over to Turner. Under this arrangement Turner built inspector's cars and rail cars during the years 1957, 1958, and 1959. No inspector's cars were built at petitioner's Montgomery plant, all such cars being built at Turner's plant. This was the car ordered from petitioner by the Southern Railroad. The design work and model construction on the inspector's car, as well as its manufacture, were done at Turner's plant. During the calendar years 1956 through 1959, Turner's gross sales of railroad repair machines on orders received by petitioner and placed with Turner for manufacture and of other products were as follows: Railroad
Other ma-
Year
machines
chines
1956
0
$1,174,583.14
1957
$458,131.56
466,092.59
1958
349,940.17
277,478.05
1959
151,759.40
287,364.70
In November and December of 1957, Turner sold superfluous inventory items with a cost basis of $112,882.55 for $23,826.74. In April 1958, Turner sold its downtown manufacturing plant, foundry, and office for a loss of $71,485.32. At the same time Turner sold inventory with a cost basis of $100,449.07 for $29,100.61 less selling expense for a loss of $80,231.24. In October of *314 1958, Turner sold its warehouse at Americus, Georgia with a tax basis of $13,214.34 for $18,000, or a gain of $4,785.66. The transplanter inventory, which was sold by Turner in the spring of 1959, was for the amount of $4,045.19. In January 1960, Turner sold its remaining property on Salisbury Road with a book value of $213,674.91 and an inventory with a book value of $65,582.57 for $279,257.48, or for no profit or loss. As a result of these various sales, as of January 1960, Turner had sold all of its original operating assets and property. The downtown manufacturing plant, foundry, and office which was sold by Turner in 1958 was not suitable for manufacture. This plant was being used for storage and the foundry was under lease to a tenant. The warehouse at Americus, Georgia, which was sold in October 1958 had been used by Turner prior to that time as a branch parts plant to service its farm machinery. Turner's operations during the calendar years 1956 through 1959 and for the period January 1 to July 10, 1960, resulted in the following net operating losses: Net operating
Year
loss
1956
$231,004.21
1957
183,512.26
1958
82,969.98
1959
1,674.52
Jan. 1, 1960 through
July 10, 1960
14,949.90
*315 During the years 1957, 1958, 1959, and the period January 1 to July 10, 1960, Turner's net operating losses were as a result of losses on the sale of Turner's surplus inventory and other assets and the chargeoff of accounts receivable. For each of these periods there was net operating income prior to the deduction of the losses on the sales of surplus inventory and other assets and the chargeoff of accounts receivable, the aggregate amount of such operating net income for the entire period being $136,906. Late in 1959 petitioner's officers reached the conclusion that Turner could not successfully market its farm machinery. By this time petitioner had increased manufacturing space in its Montgomery plant and had a further planned addition to that space Petitioner's officers had concluded that operation at one location was more economical in the manufacture of its railroad machinery than operation at separately located plants. Petitioner's officers concluded that with the planned addition to the manufacturing plant in Montgomery, they would no longer need the manufacturing space at the Turner plant for their manufacture of anticipated sales of railroad machinery. In their opinion *316 from the standpoint of furnishing space for manufacture of petitioner's railroad machines the Turner facilities had fulfilled their purpose by the end of 1959. By the end of 1959 Turner, under petitioner's management, had paid off all of its creditors. As of December 31, 1959, Turner's balance sheet showed the following: ASSETS
CURRENT ASSETS: Cash on hand and in banks
$ 34,109.26
Accounts receivable - Trade
25,887.07
Accounts receivable - Kershaw Manufacturing Com-
pany, Inc.
79,065.71
Notes receivable
300.00
Inventories
71,850.20
Prepaid expenses
7,228.71
$218,440.95
INVESTMENT IN FIXED PROPERTIES: Cost
$304,729.43
Reserve for depreciation
95,007.00
$209,722.43
Less: Mortgages payable on real estate and equipment
54,361.11
155,361.32
OTHER ASSETS: Due from Bell Foundries, Inc.
2,000.48
$375,802.75
LIABILITIES
CURRENT LIABILITIES: Accounts payable
$ 8,365.47
Property and Payroll Taxes
2,785.93
$ 11,151.40
CAPITAL STOCK AND SURPLUS: Common stock - Authorized 220,000 shares; par value
$5.00; issued and outstanding 80,000 shares
$400,000.00
Paid-in surplus
315,598.00
Earned surplus (deficit): Balance, January 1, 1959
($349,272.13)
Net income for year
(1,674.52)
(350,946.65)
364,651.35
$375,802.75
*317 As of January 31, 1960, the accounts receivable on Turner's books included $83,000 due Turner from petitioner and $227,000 due from the company that had purchased the properties from Turner in January 1960. Subsequent to January 31, 1960, and prior to February 25, 1960, the company who had purchased Turner's properties in January 1960 had made payment therefor and Turner had advanced $250,000 to petitioner so that as of February 25, 1960, Turner's accounts receivable included an amount of $333,000 due from petitioner composed of the $250,000 advanced by Turner to petitioner and $83,000 owed to Turner by petitioner for machinery manufactured by Turner for petitioner. On February 25, 1960, petitioner exercised its option to acquire the stock of Turner. The price per share at which the option was exercised was $3,1317 which amount was agreed upon as being in accordance with the provision in the agreement between Turner and petitioner. Between February 29 and April 29, 1960, petitioner acquired 78,408 shares of Turner stock for the agreedupon price, out of a total of 80,000 shares, the total cost to petitioner for acquisition of the 78,408 shares of Turner stock, after deduction of *318 transfer and escrow fees, being $246,201.95. On February 25, 1960, when petitioner exercised its option to acquire the stock of Turner, Turner had net operating losses totaling $514,110.87 which were available as a carryover to subsequent years. On July 10, 1960, Turner's net assets had a value of $349,701.45. The balance sheet attached to the final return of Turner for the taxable period ended July 10, 1960, shows assets and liabilities as follows: Assets
Cash
$ 7,656.33
Notes and accounts receiva-
ble
342,375.07
Other assets
89.41
Total
$350,120.81
Liabilities
Accrued payroll taxes, etc.
$ 419.36
Common stock
400,000.00
Paid-in surplus
315,598.00
Earned surplus (deficit)
(365,896.55)
Total
$350,120.81
On July 10, 1960, petitioner and Turner were merged. Petitioner on its Federal income tax return for its fiscal year ended April 30, 1961, claimed a deduction of $240,406.41 as a net operating loss carryover, which net operating loss carryover was explained as resulting from operations of Turner, which company was merged with petitioner on July 10, 1960. Petitioner on its Federal income tax return for its fiscal year ended April 30, 1962, claimed *319 a deduction for a net operating loss carryover in the amount of $273,704.46 with the same explanation. Respondent in his notice of deficiency disallowed the net operating loss deduction claimed by petitioner for its fiscal year ended April 30, 1961, with the following explanation: The deduction of $240,406.41 claimed as a net operating loss deduction is disallowed because you have failed to establish that the amount claimed is allowable. Accordingly, your taxable income is increased $240,406.41. Sections 172, 269, 332, 381, and 382, Internal Revenue Code of 1954. Respondent also disallowed the net operating loss deduction claimed by petitioner for its fiscal year ended April 30, 1962, with the following explanation: The deduction of $273,704.46 claimed as a net operating loss deduction is disallowed because you have failed to establish that the amount claimed is allowable. Accordingly, your taxable income is increased $273,704.46. Section 172, Internal Revenue Code of 1954. Ultimate Facts 1. The principal purpose for which petitioner entered into the agreement of August 28, 1956, with Turner was to obtain additional manufacturing *320 space for the manufacture of its railroad repair machinery with a minimum cash outlay. 2. The principal purpose for petitioner's decision in late 1959 to discontinue manufacture at Turner's plant was because of having acquired sufficient capacity at its Montgomery, Alabama plant to accommodate its anticipated needs for manufacture of railroad machinery. 3. The principal purpose of petitioner in exercising its option to acquire the Turner stock was to obtain approximately $350,000 of assets for a payment of approximately $246,000 by use of moneys in the Turner Manufacturing Company so that no cash outlay of its own money was required. Opinion Respondent takes the position that under the provisions of section 269 of the Internal Revenue Code of 1954, [1] as well as under the provisions of section 382(b), petitioner is not entitled to the net operating loss deduction carryovers claimed by it. Respondent contends that petitioner acquired control of Turner within the meaning of section 269 on February 25, 1960, and that the principal purpose for such acquisition was to evade or avoid Federal income tax by securing a deduction to which petitioner would not *321 otherwise have been entitled. Respondent recognizes that if section 269 is inapplicable, petitioner would be entitled to the loss carryover under the provisions of section 381(a) because of the provisions of section 382(b)(3)[2] unless under the provisions of his regulations petitioner is not considered to have owned the stock of Turner immediately prior to the merger of Turner and petitioner. [3] It is respondent's position that the provision of section 1.382(a)-1(a)(2) [4] of his regulations that for the purposes of "this section" section 318(a) dealing with constructive ownership of stock shall apply except that "stock acquired by the exercise of an option shall be considered as having been acquired on the date the option was acquired" is not applicable to section 382(b), but that under section 382(b) stock acquired by the exercise of an option should not be considered as having been acquired on the date the option was acquired. Respondent contends that on February 25, 1960, when petitioner acquired the Turner stock, the purpose of the acquisition was to come within the provisions of section 382(b)(3). *322 Petitioner contends that since after the date of the agreement of August 28, 1956, it had control over the management of Turner and the option to purchase the Turner stock, it should be considered as the owner of the Turner stock from that date for the purposes of section 269, relying on Mitchell v. Commissioner, 300 F. 2d 533 (C.A. 4, 1962), reversing 35 T.C. 550 (1961); Harry Trotz, 43 T.C. 127 (1964); and Pauline W. Ach, 42 T.C. 114 (1964), on appeal (C.A. 6, Aug. 10, 1964). Petitioner takes the position that in applying section 382(b)(3), it should be considered to have acquired the Turner stock on August 28, 1956, the date of the option agreement, but that even if it is considered to have acquired that stock on February 25, 1960, the purpose of its acquisition was not to meet the requirements of section 382(b)(3). Petitioner further contends that the provision of section 1.382(b)-1(d)(3) of respondent's regulations is invalid. We have found as an ultimate fact that the principal purpose of petitioner's acquisition of the option to buy Turner's stock under the agreement of August 28, 1956, was to enable petitioner to *323 have additional needed manufacturing space without the necessity of making the investment and using the time required to construct new space at its Montgomery plant. The testimony of petitioner's officers as to the principal reason for entering into the agreement with Turner supports petitioner's contention and this testimony is corroborated by the method of operation at the Turner plant after petitioner acquired control. The evidence confirms petitioner's contention that it needed this space for manufacture of its railroad machinery, particularly the inspector's cars which it manufactured for the Southern Railroad. Petitioner made some effort to continue with the manufacture of farm machinery that had been Turner's prior business. A desire for diversification by going into the production of farm machinery was another purpose of petitioner in acquiring control of Turner even though secondary to petitioner's purpose of acquiring available space for the manufacture of its railroad construction machinery. Section 269 (which contains substantially the same provisions as section 129 of the Internal *324 Revenue Code of 1939) is applicable to an acquisition only if tax avoidance is the principal purpose of such acquisition. We stated in Commodores Point Terminal Corporation, 11 T.C. 411, 418 (1948): As pointed out in Treasury regulations and in the reports of the committees of Congress, a tax avoidance purpose incidental to such a transaction does not necessarily bring it within the condemnation of section 129. The tax avoidance purpose must exceed in importance any other purpose to constitute the "principal purpose." * * * Under the facts of this case any tax avoidance purpose in petitioner's entering into the agreement of August 28, 1956, with Turner was not its principal purpose in so doing. If it is considered that petitioner acquired control of Turner within the meaning of section 269 when it exercised the option on February 25, 1960, we also consider that the principal purpose of this acquisition was not to obtain the advantage of the loss carryover. At this juncture petitioner had managed Turner's operations for over 3 years, had paid off Turner's debts, and had made an operating profit which was offset by losses on the disposition of inventory and assets *325 and by accounts receivable becoming worthless. Petitioner had managed Turner's operations with sufficient success that as of February 25, 1960, Turner's assets had a net value of approximately $350,000 as compared to approximately $250,000 which would be required for petitioner to exercise the option and obtain ownership of the Turner stock. Furthermore, the assets of Turner at this point were so liquid that petitioner could exercise the option by using Turner's own money and without any investment on its part. As one of petitioner's officers testified, it would not have been good business for petitioner not to exercise the option. Had the option not been exercised, the old stockholders would have benefited from the fact that petitioner during the past 3 years had been able to pay off all the creditors and to build up a net worth in Turner in excess of the option price of the stock. See Naeter Brothers Publishing Co., 42 T.C. 1 (1964). The value of the Turner assets in excess of the Turner stock was there to be taken merely by exercising the option. Petitioner's officers were certainly aware that by merging Turner with petitioner, Turner's net operating loss would be *326 available for use against earnings of the merged operations which under the facts here were petitioner's operations. However, in our opinion the principal purpose of the exercise by petitioner of the option to acquire the Turner stock was the more immediate purpose of reaping the benefit of the value of Turner's assets over the option price of the stock. We therefore hold that the provisions of section 269 are not applicable to petitioner's acquisition of Turner, whether it be considered that petitioner acquired control on August 28, 1956, or on February 25, 1960, so we do not deem it necessary to decide at which time petitioner did acquire control within the meaning of section 269. In our opinion it is unnecessary to determine whether the provision of section 1.382(b)-1(d)(3) of respondent's regulations is a valid interpretation of the statute or whether the provision of section 1.382(a)-1(a)(2) that stock acquired by exercise of an option shall be considered as having been acquired on the date the option was acquired is applicable to section 382(b), since we hold that the principal purpose of the exercise of the option was to obtain the Turner assets which exceeded by approximately *327 $100,000, the amount which petitioner was required to pay to exercise the option to obtain the Turner stock. In our opinion the exercise of the option was not for the purpose of meeting the requirements of section 382(b)(3). There is a dearth of evidence in the record as to why petitioner decided to merge with Turner and did on July 10, 1960, effect such merger. Because of this lack of evidence and also since the only logical reason for the merger appears to be the use of the loss carryover of Turner against anticipated profits, we infer that the use of this loss carryover was the principal purpose for the merger. In our opinion the fact that petitioner made the choice of merging because it was to its tax advantage to do so is not determinative of any issue in this case. The issues here deal with the purpose of the acquisition of control of Turner by petitioner and not the purpose of petitioner's action after such acquisition. Hawaiian Trust Company, Limited v. United States, 291 F. 2d 761, 768 (C.A. 9, 1961). We therefore hold that petitioner is entitled to the net operating loss deductions claimed by it for its fiscal years ended April 30, 1961 and 1962. Since *328 respondent made certain adjustments in the deficiency notice which were not put in issue in the petition, Decision will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Code of 1954 unless otherwise indicated. SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX. (a) In General. - If - (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or (2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation, and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation. * * *
(c) Presumption in Case of Disproportionate Purchase Price. - The fact that the consideration paid upon an acquisition by any person or corporation described in subsection (a) is substantially disproportionate to the aggregate - (1) of the adjusted basis of the property of the corporation (to the extent attributable to the interest acquired specified in paragraph (1) of subsection (a)), or of the property acquired specified in paragraph (2) of subsection (a); and (2) of the tax benefits (to the extent not reflected in the adjusted basis of the property) not available to such person or corporation otherwise than as a result of such acquisition, shall be prima facie evidence of the principal purpose of evasion or avoidance of Federal income tax. This subsection shall apply only with respect to acquisitions after March 1, 1954. ↩
2. Sec. 382(b)(3)↩, Exception to limitation in this subsection. - The limitation in this subsection shall not apply if the transferor corporation and the acquiring corporation are owned substantially by the same persons in the same proportion. 3. Sec. 1.382(b)-1(d)(3), Income Tax Regs., provides: "If stock of the transferor or acquiring corporation is acquired or disposed of for the purpose of meeting the requirements of section 382(b)(3), then for purposes of such section such stock shall not be considered to be owned by the person who acquired it. For example, if A, owning 100 percent of the outstanding stock of X Corporation and 75 percent of the outstanding stock of Y Corporation, a loss Corporation, acquires the remaining 25 percent of the outstanding stock of Y Corporation with a view to merging the two corporations, then for purposes of section 382(b)(3)↩ such 25 percent shall not be considered to be owned by A." 4. Sec. 1.382(a)-1(a)(2), Income Tax Regs. For purposes of this section, (i) section 318(a) shall apply in determining ownership of stock, except that section 318(a)(2)(C)↩ shall be applied without regard to the 50-percent limitation contained therein, and (ii) stock acquired by the exercise of an option shall be consideerd as having been acquired on the date the option was acquired. Thus, if A acquires on December 15, 1959, an option to purchase 50 percent of the outstanding stock of X Corporation and if A acquires the stock by exercising the option on January 15, 1961, A will be considered as having purchased the stock on December 15, 1959.